39 So.2d 300

**SUMMERS v. ADAMS MOTOR CO.**

**I Div. 583.**

Court of Appeals of Alabama.
Jan. 11, 1949.

Rehearing Denied March 8, 1949.

McCorvey, Turner, Rogers, Johnstone & Adams, Ben D. Turner, and R. F. Adams, all of Mobile, for appellant.

Thos. E. Twitty and Armbrecht, Inge, Twitty & Jackson, all of Mobile, for appellee.

Outlaw, Seale & Kilborn and Vincent F. Kilborn, all of Mobile, amici curiae, in support of application for rehearing.

BRICKEN, Presiding Judge.

On May 21, 1947, the appellant, Mrs. Ruby Summers, purchased a new Chevrolet automobile from Adams Motor Company.

As a part of the contract of purchase and as a condition to the delivery of the car, the parties stipulated in writing as follows:

"In further consideration of the sale of the above described motor vehicle, the undersigned Purchaser agrees not to resell or trade or exchange the same for a period of 6 months from the date hereof without first offering to resell it to the Adams Motor Company for an amount not exceeding the then reasonable market value thereof and to pay the sum of $250.00 to

Adams Motor Company as liquidated damages in the event of his failure to do so. In the event the undersigned sells or trades in the said automobile to any other party at any time, the undersigned further agrees to notify the Adams Motor Company of the name and address of the party to whom said vehicle is disposed of and the amount received by the undersigned thereof.

"Mrs. Ruby Summers
"Purchaser

"E. A. Currie
"Witness
"Invoice # 13761
"Motor # E A A 171754
"Serial # 8 E K E 13799
"5–21–47
"# 224."

Mrs. Summers sold the purchased automobile almost immediately thereafter without first offering to resell it to the Motor Company. Suit was brought in the court below to recover the stipulated liquidated damages for the breach of the contract. Mrs. Summers interposed a number of defenses stated in various ways in 12 special pleas. Pleas 1 and 2 were the general issue. Pleas 3 and 4 were to the effect that the contract sued on was not supported by any consideration whatever. Pleas 5 to 12 inclusive, which went out on demurrer, undertook to present as a defense that the contract sued on was void because it was in restraint of trade and that the restriction referred to violated public policy and was in restraint of trade. Plea 12 was to the effect that after the order for an automobile was placed with the plaintiff and a deposit made thereon that she was told, as a condition precedent to the delivery of the automobile to her, that she would have to sign the contract containing the provision above referred to which she claims constituted a breach of her contract under which she ordered the first automobile and she claimed $500.-00 damages for the inconvenience and expense that she claims she was put to by reason of the alleged breach of contract.

There was a judgment in favor of the Motor Company and against Mrs. Summers in the Inferior Civil Court of Mobile County, Alabama; on appeal to the circuit court judgment was again rendered in favor of the Motor Company and against Mrs. Summers for the amount of the liquidated damages.

In the circuit court the general affirmative charge was given in favor of the Motor Company and the jury returned a verdict in its favor for $250. Mrs. Summers brings the case here by appeal.

There is very little, if any, conflict in the evidence with respect to the contract and the Motor Company's policy of requiring its execution as a condition to the delivery of a new automobile. Mr. T. O. Stapler, general manager of the Motor Company, testified with respect to such policy as follows:

"Since the acute scarcity of automobiles resulting from the recent War, it has been our determined policy and it is still our policy to sell new Chevrolet passenger-type automobiles only to those customers who need them for their own personal use and who reside nearby and are likely to patronize our Company in servicing and maintaining such automobiles and to sell commercial automobiles only to those customers who need them and intend to use them in their own business in Mobile County and likewise are likely to patronize our Company. We have never been in the business of buying Chevrolet automobiles for the purpose of selling them to Used Car Dealers or to any others who intend to resell them for profit or intend to take them away from Mobile for use or for sale in other places where we could not be expended to service the cars. Those customers to whom we have delivered Chevrolet automobiles since the War have all represented to us that they needed them for their own use, including the Defendant in this case, and we have made every effort to make delivery first to those who needed them most. The first Chevrolet automobiles which were delivered were the 1946 models and the representations just mentioned were first handled verbally but when we discovered that there were several violations we in the latter part of 1946, the exact date being unknown, began the use of the

agreement in the form sued on in this case. We felt that any customer who really needed a car for his or her own use would not object to signing the agreement, and no customer has thus far refused to sign it; we have never required the signing of the agreement but if any customer ever refused to sign one of them we would simply tell the customer that we would make delivery to him or her after we had satisfied the demand of those customers who actually needed an automobile and were not attempting to get one from us for the purpose of selling it to someone else at a profit. During all of this time the demand for Chevrolet automobiles has been much greater than the supply, and when we delivered the Chevrolet to the Defendant in this case we had more than five hundred (500) other customers waiting for new Chevrolets who had represented to us that they had a genuine need for them and whom we believed were in perfect good faith in doing so. Therefore, the Defendant would not have gotten delivery of the particular car referred to in the agreement sued on at the particular time it was delivered if she had not signed the agreement sued on. We have found that to insist upon the signing of the agreement in the form sued on in this case is the best way that we, or any other automobile dealer, have yet conceived of finding out that customers who represent that they need an automobile are acting in good faith, and when they sign such an agreement we intend to hold them to it. To insist on signing the agreement, also, has the obvious effect of holding down prices of second-hand Chevrolet automobiles."

Mrs. Summers testified:

"Q. Mrs. Summers, you did sign this contract, of course, didn't you, Plaintiff's Exhibit No. 1? A. Yes, sir.

"Q. Is that right? A. Yes, sir.

"Q. Now, the plaintiff didn't force you to sign that contract, did they? A. Only to get the car.

"Q. In other words, they told you that they would not sell you and deliver that car, unless and until you signed that, is that right? A. I guess it is.

"Q. Is that right? You say you guess it is? A. Yes, sir.

"Q. And you signed that contract in order to enable you to get this particular automobile that is described on the face of it, isn't that right? A. Yes, sir, to get the automobile I got.

"Q. Between May 21, 1947, the time you originally got the car, and May 24th, the time you went in there with the money and paid this conditional sales contract off, you had sold that same automobile to someone other than the Adams Motor Company, isn't that right? A. Well, I sold it, but I don't remember just when I sold it.

"Q. Mrs. Summers, isn't it a fact that you had just sold that automobile to someone else, and that is where you got the money to come in and pay Adams Motor Company? A. No, sir, I had the money coming to me. I don't remember whether I paid it—I think I paid it out of money that I had.

"Q. You didn't have it the day before, did you, because your check wasn't any good, is that right? A. That is right, because the woman that owed me the money wasn't at home, so I got it that night. She owed me for the car I already had, because I had been expecting to get a new car and so I sold mine.

"Q. Did you collect that from your sister? A. That is right.

"Q. Tell us when you sold this automobile? A. The one you are referring to?

"Q. That is right. A. I don't remember the date.

"Q. Well, was it May 21st or May 22nd, 1947? A. I really wouldn't know. I don't remember the date. I don't remember what date I sold it on.

"Q. You don't remember whether you had sold the car at the time you went back in there, or not, you don't remember that? A. I don't remember whether I paid them with the money I had gotten from the car or whether I used money which I had.

"Q. But you had sold the car, hadn't you, already? A. I think I had. I think I had.

"Q. Now, Mrs. Summers, tell us how much profit you made out of that transaction when you sold the car that you had just bought, when you sold it to somebody else?

"Mr. Turner: We object to that as irrelevant, incompetent and immaterial. Sustained. Exception.

"Q. Mrs. Summers, how much did you pay Adams Motor Company for this automobile? A. About sixteen something or seventeen something, I don't know exactly which.

"Q. In the neighborhood of sixteen hundred dollars, is that right? A. I think it was in the neighborhood of seventeen hundred, best I remember.

"Q. That was on that conditional sales contract—At the time you went in there and paid for the car and signed this contract, that was the first time you knew what it was going to cost, is that right? Didn't they figure up at that time and tell you the amount of it? A. I knew about what it was going to cost before I went down there.

"Q. I didn't ask you that, Mrs. Summers. Isn't that the first time that you knew what it was going to cost you? A. First time that you all told me what it would cost.

"Q. Now, you looked at the automobile at that time, the color of it, and type of the automobile, and decided on that occasion that you liked it and would take it, is that right? A. Well, I told him that wasn't the car I ordered, but, of course, that was all he had to offer, so I said, 'I will take this one.'

"Q. That was not the car you ordered? A. No, sir.

"Q. But you decided to take it then for the first time? A. Because I asked him then when I would get another kind of car, the kind I had wanted, and he told me he did not know, so rather than to wait another two years I went ahead and got it.

"Q. And you signed this contract in order to get the car at that time? A. Yes, sir."

■ We construe the transaction as a sale of the car by the Motor Company to Mrs. Summers at an agreed price with an agreement on Mrs. Summers' part to give the plaintiff the refusal of the car for a 6 months period at its reasonable market price if and when Mrs. Summers elected to offer to sell it.

■ We have carefully examined the authorities so earnestly presented by able counsel for appellant but we find nothing in them tending to support their contention that the contract under consideration is subject to criticism.

Before the contract was executed the Motor Company was not obligated to sell or deliver the automobile that was sold to Mrs. Summers except on terms agreeable to the dealer. Neither was Mrs. Summers obligated to purchase that automobile from the Motor Company except on terms agreeable to her. It would be an unwarranted interference with their liberty of contract for this court to say that they could not enter into the agreement that was entered into, a part of which was set out above.

There is nothing uncommon about the sale of the right to purchase property on condition. Such transaction is in the nature of an option to purchase. Western Union Telegraph Company v. Brown, 253 U.S. 101, 40 S.Ct. 460, 64 L.Ed. 803.

■ If Mrs. Summers was at liberty to bind herself unqualifiedly to sell the automobile to the Motor Company at any time within the 6 months period at a stipulated price no good reason occurs to us why she should not be allowed to bind herself to sell it to the Motor Company at that price within that period, if she decided to dispose of it within that time. Nor is there any valid reason why such a provision should not be made a part of the consideration for the sale and delivery of the automobile. Larson Buick Co., Inc., v. Mosca, — Misc. —, 79 N.Y.S.2d 654; Schuler v. Daring Chevrolet Co., 76 Ga.App. 570, 46 S.E.2d 611.

Agreements granting an option to purchase corporate stock before offering such stock to others have been recognized and enforced by the courts. Volume 12 of Fletcher Cyclopedia Corporations, Section 5456; Lawson v. Household Finance Corp., 17 Del.Ch. 343, 152 A. 723; Johnson v. Tribune-Herald Co., 155 Ga. 204, 116 S.E. 810; People ex rel. Rudaitis v. Galskis, 233 Ill.App. 414; Martin v. McCloskey, 155 La. 604, 99 So. 477; Anderson v. Bean, 272 Mass. 432, 172 N.E. 647, 72 A.L.R. 959; Rosenfeld v. Einstein, 46 N.J.L. 479; Hassel v. Pohle, 214 App.Div. 654, 212 N.Y.S. 561; Barrett v. King, 181 Mass. 476, 63 N.E. 934, is approved in Bloomingdale v. Bloomingdale, 107 Misc. 646, 177 N.Y.S. 873, 878; Wright v. Iredell Tel. Co., 182 N.C. 308, 108 S.E. 744, and authorities cited; State ex rel. v. Howland v. Olympia Veneer Company, 138 Wash. 144, 244 P. 261.

The decision of the controlling question in this case adverse to appellant's contention makes a discussion of numerous technical questions unnecessary. If any error intervened it was without injury.

On the undisputed evidence before the court the Motor Company was due to recover, and the judgment in its favor is affirmed.

Affirmed.

## On Rehearing.

The appellant through her distinguished counsel, reinforced by able counsel for the used car dealers, earnestly insist that our opinion is laid in error. They give us the impression that entertains the idea that there is "a cold war" on between the Used Car Dealers and the Distributors of new automobiles. We cannot consider this case in that light. We are dealing with an Alabama contract entered into by two competent contracting parties in this State, and we are mindful of our duty to avoid, if possible, infringing upon the rights of either or both.

It was, and is, our considered judgment that the contract involved in this case is not contrary to public policy nor is it in conflict with the constitutional and statutory provisions of this State relating to monopolies. We do not interpret the contract as a price fixing or price control arrangement, independent of market control.

Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 381, 55 L.Ed. 502, and like cases, so earnestly pressed upon us by appellant does not in any degree, in our opinion, support the appellant here. In that case the Medical Company was attempting to get the court to approve "a system of interlocking restrictions by which the complainant seeks to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or subpurchasers, and thus to fix the amount which the consumer shall pay, eliminating all competition."

In the case at bar there is no restriction against reselling. The obligation in the contract is to first offer the automobile to the Motor Company if appellant elected to dispose of it within the six months period. No price is fixed. The obligation is to offer it "for an amount not exceeding *the then* reasonable value thereof." Thus the Motor Company is placed by the contract, in competition with the market for the automobile if Mrs. Summers elected to sell it within the refusal period. The owner is not required to offer it to the Motor Company at less than its then reasonable market value. The trouble with Mrs. Summers is she did not offer the automobile to the Motor Company at any price. We do not know whether the Motor Company was willing to pay Mrs. Summers as much for the automobile as she could get on the market, but we do know, that under the contract, the Motor Company was entitled to an opportunity to purchase the automobile at its then reasonable value. We agree with that portion of the dissenting opinion of Mr. Justice Holmes in the Dr. Miles Medical Company case, supra, wherein he said: "I think that at least it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear. * * * There may be ne-

cessaries that sooner or later must be dealt with like short rations in a shipwreck, but they are not Dr. Miles' medicines."

It is insisted that this court should consider the effect of an order placed by Mrs. Summers with the Motor Company for a different type or model automobile nearly two years before any car was delivered and on which she made a deposit of $25, which by mutual agreement of the parties was applied to the purchase price of the car that was delivered. The court is not called upon to adjudicate on Mrs. Summers' rights under that alleged order. Had she seen fit to stand fast and demand the delivery of the car that she ordered and delivery of the same had been refused, a different question would be before the court. In this case we are dealing with this particular contract that was made for the delivery of a particular car. The parties were at liberty to modify or rescind their former arrangement and enter into a new contract if they desired to do so and this court has no disposition to interfere with the exercise of that right.

 It is insisted that the contract sued on was not supported by a valuable consideration. The contract itself is an answer to that insistence. The opening sentence of the contract is, "in further consideration of the sale of the above described motor vehicle" the parties agree to certain terms and conditions.

It is claimed that the Motor Company received the full purchase price for the car and it is insisted that when this happened the purchaser thereby became entitled to full ownership instead of restricted ownership of the automobile. The evidence in the record is uncontradicted to the effect that the Motor Company would not sell or deliver the automobile that was sold for the money purchase price only, but as a part of the consideration, the purchaser was required to execute the contract sued on. We know of no law that required the Motor Company to part with its property for less than it bargained for which includes a six months option on the automobile, if the appellant elected to sell it within that time. The parties were dealing at arms length and we can see no reason why the benefits and detriments involved in the transaction were not a sufficient consideration, in law, for the contract that was entered into.

The claim that the effect of the contract was to tie the automobile up where appellant could not sell it except to Adams Motor Company and then at a price reduced as a result of the contract sued on, is not supported by the record. Mrs. Summers, under the contract, was obligated to offer the automobile to the Motor Company at *its then fair and reasonable market value* if she elected to sell it within the six months period; if the Motor Company did not exercise its option to buy the automobile when it was offered at its fair and reasonable market price Mrs. Summers was free to dispose of it in any lawful manner.

We cannot agree that Mrs. Summers could not lawfully give the Motor Company an option or refusal to buy the automobile, within the specific period, if she elected to sell within that time.

Security Life and Accident Company v. Carlovitz, 251 Ala. 508, 38 So.2d 274, decided by our Supreme Court, is not in conflict with the foregoing expression of our opinion of the controlling legal principles in this case.

Opinion extended. Application for rehearing overruled.