984 So.2d 395 (2007)
STATE of Alabama
v.
Diane Burnett LUPO.
1050224.
Supreme Court of Alabama.
October 12, 2007.
*396 Troy King, atty. gen., and Kevin Newsom, deputy atty. gen., and Billington M. Garrett, asst. atty. gen., Montgomery, for appellant.
Mark W. Lee, Dorothy A. Powell, and J. Alex Wyatt III of Parsons, Lee & Juliano, P.C., Birmingham, for appellee.
Matthew C. McDonald of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for amicus curiae Alabama Retail Association, in support of the appellee.
William H. Brooks and Ivan B. Cooper of Lightfoot, Franklin & White, LLC, Birmingham; and C. Dylan Sanders and Lisa S. Core of DLA Piper Rudnick Gray Cary US, LLP, Boston, Massachusetts, for amicus curiae National Council of Architectural Registration Boards, in support of the appellee.
Robert M. Hill, Jr., Florence, for amicus curiae University of North Alabama, in support of the appellee.
Dominick Matranga of Hicks Matranga & Osborne, Mobile; and Clark Neily and William H. Mellor, Institute of Justice, Arlington, Virginia, for amicus curiae Alabama Decorators, Artists, and Designers Right to Work Coalition (ADAD), in support of the appellee.
Robin Brigham Thetford and Joseph D. Thetford of Thetford & Thetford, Mobile, for amicus curiae National Kitchen & Bath Association, in support of the appellee.
*397 SMITH, Justice.
The State of Alabama, by and through the Alabama State Board of Registration for Interior Design ("the Board"), appeals from a judgment of the Jefferson Circuit Court declaring the Alabama Interior Design Consumer Protection Act, Act No. 2001-660, Ala. Acts 2001 ("the Act"), codified at § 34-15B-1 et seq., Ala.Code 1975, unconstitutional. We affirm.

Facts and Procedural History
On August 28, 2002, the Board sued Diane Burnett Lupo in the Jefferson Circuit Court. The complaint alleged that the Board had found Lupo in violation of the Act for practicing "interior design" without registering with the Board. The complaint further alleged that the Board had fined Lupo $1,500 and sought a judgment requiring Lupo to pay the fine plus $235 in costs and an injunction prohibiting Lupo from practicing interior design unless she complies with the requirements of the Act.
Lupo's answer denied the material allegations of the complaint and asserted that the Act is unconstitutional because, she argued, it is overly broad and deprives her of her liberty interest in violation of due process.
Following a nonjury trial and the submission of briefs, the trial court issued an order holding that the Act was "overly broad, unreasonable, and vague" and that it therefore violated the due-process provisions of the Alabama Constitution.[1] The Board filed a motion to alter, amend, or vacate the judgment and also moved for a stay of the judgment. The parties consented to extend the time period under Rule 59.1, Ala. R. Civ. P., for the trial court to rule on the Board's postjudgment motion. The trial court eventually denied the postjudgment motion within the time period stipulated by the parties, and the Board filed a timely notice of appeal.

Standard of Review
"`Our review of constitutional challenges to legislative enactments is de novo.' Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala.2001). Additionally, acts of the legislature are presumed constitutional. State v. Alabama Mun. Ins. Corp., 730 So.2d 107, 110 (Ala.1998). See also Dobbs v. Shelby County Econ. & Indus. Dev. Auth., 749 So.2d 425, 428 (Ala.1999) (`In reviewing the constitutionality of a legislative act, this Court will sustain the act "`unless it is clear beyond reasonable doubt that it is violative of the fundamental law.'"' White v. Reynolds Metals Co., 558 So.2d 373, 383 (Ala.1989) (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944))). We approach the question of the constitutionality of a legislative act `"`with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.'"' Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000) (quoting Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 159 (Ala.1991), quoting in turn McAdory, 246 Ala. at 9, 18 So.2d at 815).
"Moreover, in order to overcome the presumption of constitutionality, . . . the party asserting the unconstitutionality of the Act . . . bears the burden `to show that [the Act] is not constitutional.' Board of Trustees of Employees' Retirement Sys. of Montgomery v. Talley, 291 Ala. 307, 310, 280 So.2d 553, 556 (1973). See also Thorn v. Jefferson County, 375 So.2d 780, 787 (Ala.1979) (`It is the law, of course, that a party attacking a statute *398 has the burden of overcoming the presumption of constitutionality. . . . ')."
State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala.2006).

Discussion
In 1982, the legislature enacted Act No. 82-497, Ala. Acts 1982, which was codified at §§ 34-15A-1 to -7, Ala.Code 1975. Act No. 82-497 was a "title" act  it regulated the use of the title "interior designer" but did not regulate the practice of "interior design." Thus, the 1982 Act restricted the use of the title "interior designer" to those individuals who had complied with the registration provisions of the 1982 Act,[2] but it did not limit who could engage in the practice of interior design.[3]
The evidence before the trial court showed that Lupo had been an "interior decorator" for more than 22 years. The services she provided to clients consisted of advice in selecting paint colors, accessories, fabrics, and furniture for homes and businesses. Many of the services Lupo provided as an interior decorator also could have been classified as "interior design" under the definition of that term in the 1982 Act.[4] Even so, because the 1982 Act was a "title" act, Lupo was able to offer those services so long as she did not use the title "interior designer."
However, when the legislature enacted the Act, it repealed the 1982 Act.[5] Although similar in some ways to the 1982 Act, the Act differs from its predecessor in one significant manner: it restricts the practice of interior design to those individuals who have been issued a certificate of registration by the Board. In particular, § 8(c) of the Act states that an individual who practices interior design without having a certificate of registration from the Board is guilty of a Class A misdemeanor.[6] *399 See also § 3(2) to (5), Act No. 2001-660, Ala. Acts 2001 (defining the terms "certificate of registration," "interior designer," "practice of interior design," and "practicing interior design").
In January 2002, Lupo appeared before the Board to respond to charges that she was not complying with the Act. The Board alleged that Lupo was using the title "interior designer" and was practicing interior design without a certificate of registration. After a hearing, the Board determined the Lupo had violated the Act, assessed a fine of $1,500 and costs of $235, and ordered her to cease from practicing interior design without having a certificate of registration from the Board. To enforce its order, the Board then filed the present action in the Jefferson Circuit Court. In her defense to the action, Lupo asserted  and the trial court held  that the Act is unconstitutional.
As authority for her assertion that the Act is unconstitutionally overbroad, vague, and unreasonable, Lupo cites Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala.1983), a decision the trial court cited in its order finding the Act unconstitutional. The defendant in Ross Neely Express operated a truck terminal in Montgomery County. To reach the terminal, the defendant's trucks had to travel along an unpaved access road. The Alabama Air Pollution Control Commission claimed that by creating dust as they traveled along the access road Ross Neely's trucks were violating certain rules and regulations of the Alabama Department of Environmental Management ("ADEM"). 437 So.2d at 83-84.
This Court held that the ADEM rules and regulations the defendant was charged with violating were unconstitutional. 437 So.2d at 85-86. The ADEM provisions at issue stated:
"`4.2.1 No person shall cause, suffer, allow, or permit . . . a road to be used . . . without taking reasonable precautions to prevent particulate matter from becoming airborne. Such reasonable precautions shall include, but not be limited to, the following:
"`. . . .
"`(b) Application of asphalt, oil, water, or suitable chemicals on dirt roads, materials stock piles, and other surfaces which create airborne dust problems;
"`. . . .
"`4.2.2 Visible Emissions Restrictions Beyond Lot Line. No person shall cause or permit the discharge of visible fugitive dust emissions beyond the lot line of the property on which the emissions originate."'
437 So.2d at 83.
This Court stated:
"The right to due process is guaranteed to the citizens of Alabama under the Alabama Constitution of 1901, Article 1, Sections 6 and 13. This constitutional right to due process applies in civil actions as well as criminal proceedings. Pike v. Southern Bell Telephone *400 and Telegraph Co., 263 Ala. 59, 81 So.2d 254 (1955). The courts have found that this right is violated when a statute or regulation is unduly vague, unreasonable, or overbroad. In Kahalley v. State, 254 Ala. 482, 48 So.2d 794 (1950), this court found a criminal misdemeanor statute to be unconstitutionally vague. There the court stated:
"`[L]egislation may run afoul of the due process clause because of a failure to set up any sufficient guidance to those who would be law-abiding, or to advise a defendant of the nature and cause of an accusation he is called on to answer, or to guide the courts in the law's enforcement.'
"In reviewing a regulation of a county Board of Health, this court held that the central issue was reasonableness. Baldwin County Board of Health v. Baldwin County Electric Membership Corporation, 355 So.2d 708 (Ala. 1978). In City of Russellville v. Vulcan Materials Co., 382 So.2d 525 (Ala.1980), this court said:
"`The validity of a police power regulation . . . primarily depends on whether, under all the existing circumstances, the regulation is reasonable, and whether it is really designed to accomplish a purpose properly falling within the scope of the police power. Crabtree v. City of Birmingham, 292 Ala. 684, 299 So.2d 282 (1974). . . . Otherwise expressed, the police power may not be employed to prevent evils of a remote or highly problematical character. Nor may its exercise be justified when the restraint imposed upon the exercise of a private right is disproportionate to the amount of evil that will be corrected. Bolin v. State, 266 Ala. 256, 96 So.2d 582, conformed to in 39 Ala.App. 161, 96 So.2d 592 (1957).'
"Statutes and regulations are void for overbreadth if their object is achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. See Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).
"In applying the above cited principles to the regulations challenged in the case before us, we find that both 4.2.1 and 4.2.2 are constitutionally defective. Regulation 4.2.1 requires that [Ross Neely Express ('RNE')] not allow its road to be used without taking `reasonable' precautions to prevent particulate matter from becoming airborne, and lists certain precautions which shall be included. While `reasonableness' has been upheld as a legal standard in some cases, the fact remains that the regulation before us is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. See Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). How often should RNE have taken `reasonable' precautions? Must it take all of the suggested precautions, as well as others? If the precautions taken fail to eliminate airborne particulate matter completely, has RNE failed to take reasonable precautions per se?

"The stipulated facts show that RNE used 50 to 60 truckloads of slag in the construction of the road in 1974. Since that time, on at least four occasions, slag and chert had been added to the road surface. On three occasions oil was applied to the surface. (We note that this was one of the suggested `reasonable precautions' contained in the regulation itself.) But in 1981, ADEM alleged that RNE was in violation of § 4.2.1 because dust had been observed rising from the *401 road, and the trial court agreed. This appears to be a classic example of a case where men of common intelligence must necessarily guess as to the requirements of the regulation. See Connally v. General Construction Co., supra.

"Regulation 4.2.2 is unconstitutionally restrictive. Visible fugitive dust emissions may not be permitted to float beyond the lot line of the property on which the emissions originate. . . . Such a regulation is clearly overbroad, encompassing every situation in which visible fugitive dust emissions move across a lot line, without regard to damage, injury, or inconvenience caused, reasonable attempts at control, etc. This invades the area of protected freedom, severely restricting the use of property, and creates a situation where discriminatory enforcement is almost inevitable.
"We find both of the regulations under consideration to be unreasonable. ADEM argues that they are a proper exercise of the police power of the State of Alabama, going to the protection of health, public convenience, public welfare, protection of property, and the maintenance of good order. See James v. Todd, 267 Ala. 495, 103 So.2d 19 (1958); Alosi v. Jones, 234 Ala. 391, 174 So. 774 (1937). While the above matters are clearly subject to the police power, and while the control of air pollution is greatly to be desired, we find that the restraint imposed by the two regulations before us, as written, imposes a restraint upon the use of private property that is disproportionate to the amount of evil that will be corrected. Thus, they fail the test of constitutionality under City of Russellville v. Vulcan Materials Co., supra."
437 So.2d at 84-86.
In response to Lupo's argument that, under the principles stated in Ross Neely Express, the Act is unconstitutionally overbroad, vague, and unreasonable, the Board argues that Lupo failed to prove beyond a reasonable doubt that the Act is unconstitutionally overbroad, vague, or unreasonable. We disagree.
Lupo has sufficiently demonstrated that the Act  particularly in its definition of the "practice of interior design"  restricts her ability to provide interior-decorating services. When asked at trial to explain the services she provided as an interior decorator, Lupo testified:
"I go into someone's house and I pick out their paint colors, their art, flooring, as in carpet, telling them if they need to have their hardwoods redone or maybe, you know, linoleum come up and tile go down. . . . [I]t's strictly the surfaces of the interiors of [a client's] house. I work with contractors and architects to draw up that. I don't do drawings. . . . I am strictly doing surfaces as far as paint colors, accessories, fabrics, furniture, things like that."
Those activities  giving advice to clients as to paint colors, art, flooring, accessories, fabrics, and furniture  are within the definition of the "practice of interior design" in § 3(4) of the Act. That section defines the "practice of interior design" as:
"The performance of, or offering to perform, services for a fee or other compensation, directly or indirectly, to another person, or to a partnership, corporation, or other legal entity, in connection with the design, utilization, furnishing, or fabrication of elements in interior spaces in buildings, homes, and related structures. These services include, but are not limited to, the following: Programming the functional requirements for interior spaces; planning interior spaces; preparing analyses of user needs for interior spaces; preparing designs, drawings, and specifications *402 for selection, use, location, color, and finishes of interior walls, materials, equipment, furnishings, furniture, and personal property; administering contracts for fabrication, procurement, or installation in connection with reflected ceiling plans, space utilization, furnishings, or the fabrication of nonstructural elements within and surrounding interior spaces of buildings."
However, certain activities are exempt from the definition of the practice of interior design in § 3(4)d of the Act (codified at § 34-15B-3(4)b.4). Lupo emphasizes the following exemption (which the parties refer to as the "retail-sale exemption"):
"4. The performance of services pursuant to selling, selecting, or assisting in selecting personal property or fixtures, such as, but not limited to, furnishings, decorative accessories, furniture, paint, wall coverings, window treatments, floor coverings, surface mounted lighting, or decorative materials, pursuant to a retail sale; installing or coordinating installation as part of the prospective retail sale; or providing computer-aided or other drawings for the purpose of retail sales, provided those drawings are for placements or materials lists. Provided, however, an individual, partnership, or corporation shall not use the title designations set forth in Section 34-15B-8 nor receive a certificate of registration without successful completion of the NCIDQ examination and/or a sealed level examination, as applicable, and as approved by the board. Services performed shall be subject to all fire, safety, building, and construction codes."[7]
At trial, the chairperson of the Board, Courtney Oglesby, testified that the definition of the "practice of interior design" included such things as selecting paint colors or pillows for a sofa. According to Oglesby, an individual such as Lupo could not offer advice to clients regarding the selection of paint colors or "throw pillows" unless she was registered with the Board in accordance with the Act or offered the services "pursuant to a retail sale" under the retail-sale exemption.
*403 The Board, however, argues that "[t]he language of the Act does not compel such a broad reading" and that the definition of the practice of interior design "does not contemplate mere recommendations of paint colors and throw pillows, but more comprehensive services involving analyzing, planning, drawing, and preparing specifications for interior spaces." (Board's brief, pp. 16-17.) The Board also argues that this Court should read the definition of the practice of interior design in the Act "as narrowly as its language permits, if necessary to avoid invalidity." (Board's brief, p. 19.) The Board relies on the following principle of statutory construction:
"Where the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction which would uphold it. 11 Am.Jur. p. 725. Or, as otherwise stated, it is the duty of the courts to adopt the construction of a statute to bring it into harmony with the constitution, if its language will permit. This principle has been often recognized by our own Court. It was well stated by the Supreme Court of the United States in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352 [(1937)], in the following language:
"`The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same."'
Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 10, 18 So.2d 810, 815 (1944) (citations omitted).
The Board does not, however, show how McAdory applies to the Act. The Board cites the definition of the practice of interior design in the Act, states the rule from McAdory, and urges this Court to read the definition narrowly, but the Board does not explain how the plain language of the Act may be read so narrowly.
In Ex parte McCormick, 932 So.2d 124, 132 (Ala.2005), this Court noted:
"In any case involving statutory construction, our inquiry begins with the language of the statute, and if the meaning of the statutory language is plain, our analysis ends there. Ex parte Moore, 880 So.2d 1131, 1140 (Ala.2003) (""The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute."") (quoting Ex parte Weaver, 871 So.2d 820, 823 (Ala.2003), quoting in turn Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala.1996)). This Court in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275-76 (Ala. 1998), explained:
"`In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
"`"`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'

*404 "729 So.2d at 275-76 (quoting Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998), additional citations omitted). See also 729 So.2d at 276 (explaining that the separation-of-powers doctrine requires a court to use the plain-meaning rule in construing a statute and that `only if there is no rational way to interpret the words as stated will [a court] look beyond those words to determine legislative intent')."
In the present case, the definition of the "practice of interior design" plainly includes, as the chairperson of the Board acknowledged, things such as offering advice to a client regarding the selection of paint colors and sofa pillows, as well as the other services Lupo testified she offers as an interior decorator. Section 3(4) of the Act (§ 34-15B-3(4)) provides: "These [interior-design] services include, but are not limited to, the following: . . . preparing designs, drawings, and specifications for selection, use, location, color, and finishes of interior walls, materials, equipment, furnishings, furniture, and personal property. . . ." The retail-sale exemption in § 3(4)d of the Act (§ 34-15B-3(4)b.4) makes it even clearer, because it excludes from the definition of the practice of interior design "[t]he performance of services pursuant to . . . selecting, or assisting in selecting personal property or fixtures, such as, but not limited to, furnishings, decorative accessories, furniture, paint, wall coverings, window treatments, floor coverings, surface mounted lighting, or decorative materials" so long as those activities are "pursuant to a retail sale."[8]
If the selection of "decorative accessories" or "paint" were not included in the "practice of interior design," there would be no need to exempt those activities under the retail-sale exemption. Consequently, we reject the Board's "narrow" reading of the definition, because the Board's reading would render portions of the retail-sale exemption superfluous. Ex parte D.B., 975 So.2d 940, 954 (Ala.2007) ("`"`A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.'"' Ex parte Wilson, 854 So.2d 1106, 1110 (Ala.2002) (quoting Ex parte Welch, 519 So.2d 517, 519 (Ala.1987), quoting in turn 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 46.06 (4th ed.1984)).").
The issue, therefore, is whether the Act is overbroad or unreasonable in its regulation of those activities when they are not related to a retail sale. In Scott & Scott, Inc. v. City of Mountain Brook, 844 So.2d 577 (Ala.2002), this Court examined the concepts of overbreadth and unreasonableness:
"`"An overbreadth challenge is based on the statute's `possible direct and indirect burdens on speech."' United States v. Acheson, 195 F.3d 645, 650 (11th Cir.1999) (quoting American Booksellers v. Webb, 919 F.2d 1493, 1499-500 (11th Cir.1990)). The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." City of Chicago v. Morales, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The doctrine "`protects the public from the chilling *405 effect such a statute has on protected speech; the court will strike down the statute even though in the case before the court the governmental entity enforced the statute against those engaged in unprotected activities.'" Acheson, 195 F.3d at 650 (quoting Nationalist Movement v. City of Cumming, 934 F.2d 1482, 1485 (11th Cir. 1991) (Tjoflat, J., dissenting)).'
"[Butler v. Alabama Judicial Inquiry Comm'n,] 802 So.2d [207,] 213 [(Ala. 2001)]. However, in Friday v. Ethanol Corporation, 539 So.2d 208 (Ala.1988), this Court recognized a broader application of the overbreadth doctrine by stating, in pertinent part:
"`The doctrine of overbreadth recognizes that a state legislature may have a legitimate and substantial interest in regulating particular behavior, but "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) [quoting Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)]. Historically, the overbreadth doctrine has been used by the federal courts to prevent a chilling effect on First Amendment freedoms. Note, The First Amendment Overbreadth Doctrine, 83 Harv. L.Rev. 844, 852 (1970). The overbreadth doctrine does not apply to commercial speech under the Federal Constitution. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). However, the overbreadth doctrine under the Alabama Constitution has been applied in due process cases not involving First Amendment freedoms. See Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala.1983).'
"539 So.2d at 215. In Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala.1983), this Court stated:
"`Statutes and regulations are void for overbreadth if their object is achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. . . . '
"437 So.2d at 85.
"`This Court has also recognized that the right to due process under the Alabama Constitution is violated when a statute, regulation, or ordinance imposes restrictions that are unnecessary and unreasonable upon the pursuit of useful activities in that they do not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity.'
"Friday v. Ethanol Corp., 539 So.2d at 216 (citing Ross Neely Express, Inc., 437 So.2d at 84-86; City of Russellville v. Vulcan Materials Co., 382 So.2d 525, 527-28 (Ala.1980); Leary v. Adams, 226 Ala. 472, 474, 147 So. 391 (1933); Baldwin County Bd. of Health v. Baldwin County Elec. Membership Corp., 355 So.2d 708 (Ala.1978)).
"`"The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary."' Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (quoting Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954)). If an ordinance is `"fairly debatable, a court will not substitute its judgment for that of the municipal government body acting in a legislative capacity."' *406 City of Russellville v. Vulcan Materials Co., 382 So.2d at 526 (quoting City of Birmingham v. Norris, 374 So.2d 854, 856 (Ala.1979))."
844 So.2d at 593-95.
In the present case, § 2 of the Act (§ 34-15B-2) includes the following statement of legislative findings:
"The Legislature finds and declares that interior design is a learned profession, involving issues such as indoor pollution, fire safety, space planning, and requirements of special needs citizens. For this is a matter of public interest, safety protection, and concern that persons practicing interior design merit and receive the confidence of the public and that only qualified persons be permitted to practice interior design in the State of Alabama. This act shall be liberally construed to carry out these purposes."
The Board contends that the Act is merely a licensing statute that "protects the public by enabling the public to rely on licensure as proof of qualifications." (Board's reply brief, p. 2.) We disagree.
At the trial in the circuit court, the chairperson of the Board denied that the State had any interest in regulating advice regarding things such as selecting throw pillows on the sofa of a private individual's residence; she testified that "[t]he State doesn't have any interest in the color of your living room walls. The State is trying to determine the difference in a professional and nonprofessional." In its materials to this Court, the Board does not assert that the State has a legitimate interest in regulating "the color of . . . living room walls" or the number or type of throw pillows on a sofa in an individual's residence. The Board suggests, however, that the Act is necessary to ensure that a person who makes recommendations regarding materials to be installed in a residence or business is "qualified" to select materials that comply with regulations such as fire codes or with laws such as the Americans with Disabilities Act.
However, the existence of the retail-sale exemption negates the Board's assertion that the qualifications for interior designers included in the Act are necessary to ensure that individuals engaged in the practice of interior design recommend materials that comply with applicable laws and regulations. Under the retail-sale exemption in § 3(4)d (§ 34-15-3(4)b.4), an individual not registered with the Board may offer advice about the selection of a number of materials  "furnishings, decorative accessories, furniture, paint, wall coverings, window treatments, floor coverings, surface mounted lighting, or decorative materials"  to be installed in houses or places of business, if that advice is given "pursuant to a retail sale." Additionally, the retail-sale exemption states that the design "[s]ervices performed shall be subject to all fire, safety, building, and construction codes." Id. (emphasis added). Thus, the retail-sale exemption permits nonregistered individuals to make  if done "pursuant to a retail sale"  a recommendation of those materials that would comply with applicable laws and codes. If the position of the Board is correct, we do not understand how acting "pursuant to a retail sale" qualifies a nonregistered individual to make such a recommendation. Accordingly, the Board's justification of the Act is not reasonable.
We conclude, therefore, that the Act "`imposes restrictions that are unnecessary and unreasonable upon the pursuit of useful activities'" and that those restrictions "`do not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity.'" Scott & Scott, 844 So.2d at 594 (quoting Friday v. Ethanol Corp., 539 So.2d at 216). *407 Consequently, the Act violates Art. 1, §§ 6 and 13, Ala. Const. of 1901.
The Board argues that this Court should sever any provision of the Act it finds unconstitutional rather than declaring the entire act unconstitutional.
"If a portion of a legislative enactment is determined to be unconstitutional but the remainder is found to be enforceable without it, a court may strike the offending portion and leave the remainder intact and in force. Courts will strive to uphold acts of the legislature. The inclusion of a severability clause is a clear statement of legislative intent to that effect, but the absence of such a clause does not necessarily indicate the lack of such an intent or require a holding of inseverability."
City of Birmingham v. Smith, 507 So.2d 1312, 1315 (Ala.1987). See also § 1-1-16, Ala.Code 1975.
The Act includes a severability provision. § 18, Act No. 2001-660, Ala. Acts 2001 ("The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains."). However, the unconstitutional provision in the Act is its overbroad and unreasonable definition of the "practice of interior design," which is "so intertwined with the remaining portions" of the Act that the Act would be meaningless without it. State ex rel. Jeffers v. Martin, 735 So.2d 1156, 1159 (Ala.1999) ("Under these well-established principles, the judiciary's severability power extends only to those cases in which the invalid portions are `"not so intertwined with the remaining portions that such remaining portions are rendered meaningless by the extirpation."' Hamilton v. Autauga County, 289 Ala. 419, 426, 268 So.2d 30, 36 (1972) (quoting Allen v. Walker County, 281 Ala. 156, 162, 199 So.2d 854, 860 (1967)). If they are so intertwined, it must `"be assumed that the legislature would not have passed the enactment thus rendered meaningless."' Id. In such a case, the entire act must fall. 2 [Norman J.] Singer, [Sutherland Statutory Construction], § 44.04, at 502 [(5th ed.1992)]."). Consequently, the objectionable portion cannot be severed, and the Act in its entirety is unconstitutional.

Conclusion
The judgment of the trial court declaring Act No. 2001-660, Ala. Acts 2001, unconstitutional is affirmed.
AFFIRMED.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, BOLIN, and MURDOCK, JJ., concur.
PARKER, J., concurs specially.
PARKER, Justice (concurring specially).
I agree with the majority opinion that the Alabama Interior Design Consumer Protection Act, Act No. 2001-660, Ala. Acts 2001 ("the Act"), is unconstitutional.
I write to express concern over the State's invocation of Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955):
"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."
The citizens of Alabama expect this Court to decide cases based on the timeless meaning of the United States Constitution and the Alabama Constitution of 1901, not merely on the basis that "[t]he day is gone" for a certain school of jurisprudence. Our oath of office as Justices requires this. However, I assure the State that this *408 Court did not declare the Act unconstitutional because the Justices think its provisions are "unwise, improvident, or out of harmony" with their own school of thought. This Court declared the Act unconstitutional because it violates Art. 1, §§ 6 and 13, Alabama Constitution of 1901.
In 1901, when the Alabama Constitution was drafted and ratified, economic liberties such as the liberty of contract, the right to enforce a contract, the right to own and to use property, and the right to enter into and to practice the common occupations were highly valued. United States Supreme Court cases such as Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897) (concerning the right of a Louisiana shipper to insure his shipment with an out-of-state insurer not licensed to do business in Louisiana), and Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (concerning the right of a bakery and bakery employees to contract to work more hours than allowed by New York law), upheld economic rights under the concept of the liberty of contract as guaranteed in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Although it is fashionable to speak of the "demise of the Lochner era," and although later cases such as Williamson, supra, and West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), give less protection to economic liberties and more deference to such state interests as health and safety, the Court has never denied that the liberty of contract is a constitutionally protected right.
The Alabama Constitution of 1901 was in the process of being drafted and ratified during the Allgeyer-Lochner era. Thomas Goode Jones, one of the primary drafters of that constitution, served as governor from 1890 to 1894. During that time an economic crisis led to a proposal to issue a moratorium on mortgage foreclosures. Governor Jones opposed that proposal, both because he thought it was unconstitutional and because he thought it was economically unwise.[9] The framers of the Alabama Constitution of 1901 protected economic liberties and other liberties in the Due Process Clause of Art. I, § 6 ("[He] shall not . . . be deprived of life, liberty, or property, except by due process of law"), using language similar to the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. But they also protected economic liberties by adopting Art. I, § 1 ("That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."), § 13 ("That all courts shall be open; and that every person, for any injury done to him, in his lands, goods, person, and reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."), § 22 ("That no . . . law, impairing the obligations of contracts . . . shall be passed by the legislature. . . ."),[10] § 23 ("private property shall not be taken for, or applied to public use, unless just compensation be *409 first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner," thereby providing protection that goes beyond those found in the "takings" clause of the Fifth Amendment to the United States Constitution), § 35 ("That this sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."), and § 36 ("That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate."). Concerning § 35, this Court stated in Churchill v. Board of Trustees of University of Alabama in Birmingham, 409 So.2d 1382, 1389 (Ala.1982):
"The prohibition of § 35 is not to be taken lightly. The `compelling need' criterion for governmental involvement in profit-making ventures mandates that each challenged activity undergo careful scrutiny on a case by case basis to avoid the constitutional `usurpation and oppression' admonition."
These provisions lead me to conclude that the framers of the Alabama Constitution of 1901 valued economic liberties as highly as did the United States Supreme Court Justices who decided Allgeyer and Lochner and that they intended to enshrine in the Alabama Constitution strong protections for economic liberties. As can be seen from the provisions quoted above, the safeguards for economic liberties the framers placed in the Alabama Constitution of 1901 are much more extensive than those in the United States Constitution.
This Court has continued to recognize the value of economic liberties. In City of Mobile v. Rouse, 233 Ala. 622, 173 So. 266 (1937), this Court invalidated a city ordinance prohibiting persons from charging lesser fees than the ordinance specified for certain personal services, in that case barber services and laundry services. The Court in Rouse acknowledged that in Franklin v. State ex rel. Alabama State Milk Control Board, 232 Ala. 637, 169 So. 295 (1936), it had upheld regulation of the milk industry, but it distinguished that case because, it reasoned, the milk industry was "affected `with a public interest."' Rouse, 233 Ala. at 625, 173 So. at 268. The Court stated:
"Personal service can not become affected `with public interest' unless the service rendered is official in character, or is rendered in connection with a business `affected with public interest' or `devoted to a public purpose.'"
233 Ala. at 625, 173 So. at 268.
Rouse recognized both the liberty of contract and the right to engage in an occupation:
"In Meyer v. State of Nebraska, [262 U.S. 390 (1923)], the Supreme Court of the United States, treating what is embraced in the term `liberty' as guaranteed by the Constitution, observed: `While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life,[11] to acquire useful knowledge, *410 to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.' 262 U.S. 390, at page 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446."
Rouse, 233 Ala. at 624, 173 So. at 268 (emphasis added).
Similarly, in Summers v. Adams Motor Co., 34 Ala.App. 319, 39 So.2d 300 (1949), the Court of Appeals upheld a liquidated-damages provision of a contract for the sale of an automobile. Summers, the purchaser, had agreed not to resell the car within six months without first offering to resell it to Adams Motor Company for its reasonable market value. The court stated:
"Before the contract was executed the Motor Company was not obligated to sell or deliver the automobile that was sold to Mrs. Summers except on terms agreeable to the dealer. Neither was Mrs. Summers obligated to purchase that automobile from the Motor Company except on terms agreeable to her. It would be an unwarranted interference with their liberty of contract for this court to say that they could not enter into the agreement that was entered into. . . . "
34 Ala.App. at 323, 39 So.2d at 303.
In Juneman Electric, Inc. v. Cross, 414 So.2d 108, 112 (Ala.Civ.App.1982), the Court of Civil Appeals stated: "The police power of the state enters into every contract, but the exercise of that power must be for an end which is in fact public, and the means must be reasonably adapted to the end to be achieved."
In Alabama Power Co. v. The Citizens of Alabama, 740 So.2d 371 (Ala.1999), this Court recognized that the United States Supreme Court has backed away from the strong emphasis on economic rights found in Lochner and other earlier cases. Justice See, writing for the Court, observed:
"While this Court has not engaged in a campaign to strike down economic legislation, it has applied some of the less activist substantive-due-process formulations previously employed by the Supreme Court of the United States. For example, in Franklin v. State ex rel. Alabama State Milk Control Bd., 232 Ala. 637, 642-44, 169 So. 295, 299-300 (1936), this Court acknowledged the Supreme Court's pre-Lochner `affected-with-the-public-interest' test in upholding a statute regulating the production of milk. (Citing Munn v. Illinois, 94 U.S. (4 Otto) 113, 130, 24 L.Ed. 77 (1876) (holding that a state law regulating rates charged by grain elevators did not violate the elevator operators' substantive-due-process rights because the statute was `affected with the public interest' and, thus, within the police power of the state)). In [Alabama State Federation of Labor v.] McAdory, 246 Ala. [1] at 12, 18 So.2d [810] at 818 [(1944)], this Court quoted the Supreme Court's post-Lochner means-end relation test in upholding certain provisions of a labor statute. (Citing Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (stating that legislation did not impinge on substantive-due-process rights as long as it was not `unreasonable, arbitrary or capricious' and `the *411 means selected [had] a real and substantial relation to the object sought to be attained'))."
740 So.2d at 380. While acknowledging that economic liberties are not protected as vigorously as they were during the Lochner era, this Court nonetheless recognized that economic liberties still enjoy protection.
The State's argument that certification of interior designers[12] is necessary to ensure that designers are competent to choose safe products for use in interior design fails for two reasons: (1) federal and state commissions already exist to ensure that unsafe materials are not available for use in homes or businesses; and (2) there is no state requirement that homeowners or businesses retain any interior decorator or designer to decorate their homes or offices. If the public interest is not threatened by allowing homeowners and businesspersons to design their own houses and offices, it is difficult to understand how that interest is threatened by allowing them to retain interior designers who are not certified.
Not only are Lupo's rights to contract and to engage in her chosen occupation at stake in this case, but also the rights of the people of Alabama to contract with her. If a homeowner or businessperson wants to express himself by decorating his home or his office in a certain way,[13] and if that person believes Lupo can best provide the design that he desires, the State should not tell that person that he may not contract with Lupo merely because Lupo lacks state certification or an academic degree. Nor should this Court embrace the paternalistic notion that the average citizen is incapable of choosing a competent interior designer without the State's help. The economic liberty of contract remains a protected right in Alabama, especially in a field like interior design that involves expressive activity.
Accordingly, I concur with the majority opinion. I write separately only to emphasize that the rights infringed by the Act, which the majority declares unconstitutional, are even more extensive than stated in the majority opinion.
NOTES
[1] The trial court later issued an order enjoining the Board from enforcing the Act.
[2] Section 5 of Act No. 82-497 created the "Alabama State Board of Registration for Interior Designers," and §§ 2 and 3 required an individual to register with that board before using the title "interior designer."
[3] Section 1(d) of the 1982 Act provided: "Nothing contained herein shall preclude any person from performing, or offering to perform, [interior-design services], provided that such person shall not be permitted to use or be identified by the title `interior designer.'"
[4] Section 1(d) of the 1982 Act defined "interior design" as

"the performance of, or offering to perform, services hereinafter described, for a fee or other compensation, to another person, or to a partnership, corporation, or other legal entity, in connection with the design, utilization, furnishing or fabrication of elements in interior spaces in buildings, homes, and related structures. Such services include, but shall not be limited to, the following: programming the functional requirements for interior spaces; preparing analysis of user needs; planning interior spaces; preparing designs, drawings and specifications for selection, use, location, color, and finishes of interior materials, equipment, furnishings and furniture; and administering contracts for fabrication, procurement or installation in connection with such designs, drawings and specifications."
[5] Section 20, Act No. 2001-660, Ala. Acts 2001.
[6] Section 6 of the Act states the following requirements for obtaining a certificate of registration from the Board:

"(b)(1) The board may issue a certificate of registration authorizing an individual to engage in the practice of interior design and use the title of interior designer in the State of Alabama, only if:
"a. The applicant is determined by the board to be of good moral character.
"b. The applicant has successfully passed the National Council for Interior Design Qualification (NCIDQ) examination, or an equivalent examination, accepted and approved by the board, based on the standards set by the NCIDQ.
"c. The applicant is a graduate of a Foundation for Interior Design Education Research (FIDER) accredited interior design program or its equivalent based on contents standards set by FIDER.
"(2) Each applicant shall have a combined minimum record of passing 48 semester or 60 quarter hours of board approved interior design education and practical experience under the guidance of a person holding a valid certificate of registration, or any individual approved by the board to total a minimum of six years.
"(3) The board shall approve the equivalent interior design educational programs based on content standards set by FIDER and standards set by the NCIDQ or subsequent and equal accrediting and testing agencies."
[7] On April 18, 2006, the Governor approved Act No. 2006-518, Ala. Acts 2006. Section 2 of Act No. 2006-518 "expressly preserved, until October 1, 2007," those parts of Act No. 2001-660 codified at §§ 34-15B-1 to 34-15B-18, Ala.Code 1975. However, § 2 of Act 2006-518 amended § 34-15B-3(4)b.4, Ala. Code 1975 (§ 3(4)d of the Act), to read as follows:

"The performance of consultation or services pursuant to selling, selecting or assisting in selecting personal property or fixtures, such as, but not limited to, furnishings, decorative accessories, furniture, paint, wall coverings, window treatments, floor coverings, surface mounted lighting, or decorative materials, pursuant to a consultation or retail sale; installing or coordinating installation as part of the prospective retail sale or consultation; or providing computer-aided or other drawings for the purpose of retail sales or consultations, provided those drawings are for placements or material lists. Nothing herein shall prohibit any person from charging a fee for such services whether or not a consultation or retail sale is consummated. Provided, however, an individual, partnership, or corporation shall not use the title designations set forth in Section 34-15B-8 nor receive a certificate of registration without successful completion of the NCIDQ examination and/or a sealed level examination, as applicable, and as approved by the board. Services performed shall be subject to all fire, safety, building and construction codes."
(Emphasis added to indicate changes made by Act No. 2006-518.)
Act No. 2001-660 was the legislation under which the Board charged Lupo; Act No. 2006-518 did not take effect until after the trial court had issued its order declaring Act No. 2001-660 unconstitutional. Consequently, we do not consider Act No. 2006-518 in our review of Act No. 2001-660, and we express no opinion regarding the effect of Act No. 2006-518.
[8] This section of the Act was amended effective April 18, 2006. See supra note 7.
[9] Letter from R.A. Moseley, Jr., to Governor Thomas G. Jones (August 14, 1893); letter from Governor Thomas G. Jones to R.A. Moseley, Jr. (August 16, 1893) (cited and quoted in John Eidsmoe, Warrior, Statesman, Jurist for the South: The Life, Legacy and Law of Thomas Goode Jones 168-69 (Sprinkle Publications 2003)). For a general understanding of the convictions of the framers of the Constitution of 1901 concerning economic liberties, see Eidsmoe at 173-88.
[10] The term "liberty of contract" generally refers to the right to enter into a contract; the term "impairing the obligations of contracts" involves the state's preventing the enforcement of contracts already made.
[11] The Alabama Court of Civil Appeals has held that "[t]he right to engage in the profession of dentistry is a property right, and that right may be abrogated only by compliance with due process of law." Delavan v. Board of Dental Exam'rs of Alabama, 620 So.2d 13, 16 (Ala.Civ.App.1993); see also Board of Dental Exam'rs of Alabama v. Townsley, 668 So.2d 4, 5 (Ala.Civ.App.1993). I recognize that the state may have a greater interest in regulating a profession than in regulating other occupations.
[12] The briefs of both parties discuss the differences between interior "design" and interior "decoration." In this writing I will use the term "interior design" without defining the differences between these terms or deciding which term best describes Lupo's work.
[13] Hornell Brewing Co. v. Brady, 819 F.Supp. 1227 (E.D.N.Y.1993), implied that decoration of one's home is a means of expression. Hornell argued that the name of the alcoholic beverage it was marketing  "The Original Crazy Horse Malt Liquor"  was entitled to constitutional protection as freedom of expression above that ordinarily afforded commercial speech. The court "explicitly reject[ed] plaintiff's argument that use of the Crazy Horse name is actually the personal expression of Don Vultaggio, the Chairman and co-owner of Hornell Brewing, and therefore is entitled to the utmost constitutional protection. Plaintiff cannot seriously liken Vultaggio's freedom of expression in decorating his home in Southwestern style to the use of the name Crazy Horse on a nationally marketed alcoholic beverage." 819 F.Supp. at 1233 n. 7. See also Commonwealth v. Bricker, 542 Pa. 234, 666 A.2d 257 (1995), in which the Pennsylvania Supreme Court held that Bricker's display of a flag in her home was constitutionally protected expression. The court stated: "[S]ome might argue that there are few forms of self-expression as personal and important as the manner in which we decorate our homes. . . . [T]he government must satisfy constitutional scrutiny before it can tell the citizens of this Commonwealth what pictures they may hang on their walls or what symbols they may display in the sanctity of their homes." Bricker, 542 Pa. at 242, 666 A.2d at 261.