MAIN, Justice.
Keith Westphal and Joyce Osborn Wilson filed this lawsuit against David North-cutt III, DMD, Bobby R. Wells, DMD, Stephen R. Stricklin, DMD, Thomas T. Willis, DMD, Sam J. Citrano, Jr., DMD, William Chesser, DMD, and Sandra Kay Alexander, RDH, in their official capacities as members of the Alabama Board of Dental Examiners (hereinafter referred to collectively as “the Dental' Board”). West-phal and Wilson sought a judgment declaring unconstitutional the portion of the Alabama Dental Practice Act, § 34-9-1 et seq-., Ala.Code 1975, that makes it unlawful for anyone other than a duly licensed dentist to perform teeth-whitening services and soüght a permanent injunction forbidding future enforcement of the prohibition in the Act on teeth-whitening services performed by non-dentists. The parties submitted cross-motions for a summary judgment, and the Jefferson Circuit Court entered a summary judgment in favor of the Dental Board and against Westphal and Wilson. Westphal and Wilson appeal. We affirm.
*686 I. Facts and Procedural History ’
Teeth" bleaching, commonly known as “teeth whitening,” is a procedure that temporarily lightens the color of a person’s teeth by application of a peroxide-based solution.- Traditionally, consumers had the option of “professional grade” teeth-whi-teriing services provided by licensed dentists or “consumer grade” over-the-counter teeth-whitening products sold at local pharmacies. Non-dentist entrepreneurs have also entered the teeth-whitening market, offering teeth-whitening services in salons, spas, or mall kiosks. Generally, non-dentist teeth-whitening providers assist the customer, either directly or indirectly, in applying the whitening solution and typically use a light source to accelerate the whitening effects.
Although the sale of teeth-whitening products directly to consumers is largely unregulated, the advent of non-dentist teeth-whitening services has met with re-sistence from some state dental boards, which have argued that teeth-whitening services constitute the" practice of dentistry and, as such, should be performed only by licensed dentists." See, e.g., North Carolina State Bd. of Dental Exam’rs v. Federal Trade Comm’n, - U.S. -, 135 S.Ct. 1101, 191 L.Ed.2d 35 (2015); Martinez. v. Mullen, 11 F.Supp.3d 149 (D.Conn.2014). In White Smile USA, Inc. v. Board of Dental Examiners of Alabama, 36 So.3d 9 (Ala.2009), we were.confronted with just such a controversy. In that case we determined that the non-dentist teeth-whitening services at issue there constituted the “practice of dentistry” as that phrase was then defined by § 34-9-6, Ala.Code 1975. In 2011 the legislature amended- § 34-9-6 to expressly include teeth bleaching or whitening within the practice of dentistry. Thus, Alabama law now prohibits non-dentists from offering teeth-whitening services. The Alabama Board of Dental Examiners is responsible for enforcing Alabama’s Dental Practice Act. § 34-9^0(a). By statute, the Board consists of six dentists and one dental hygienist.
Westphal and Wilson each desire to operate a teeth-whitening business in Alabama. Neither Westphal nor Wilson, however, is a licensed dentist, and neither has any dental training. Westphal canceled plans to expand his North Carolina-based teeth-whitening business into Alabama when he learned such a business was prohibited by the Dental Practice Act. Wilson stopped offering teeth-whitening services upon receipt of a cease and desist letter from the Dental Board. On April 30,2013, Westphal and Wilson filed this action against the Dental Board seeking a judgment declaring that the Alabama Dental Practice Act' violated various provisions of the Alabama Constitution and also requesting a permanent injunction forbidding enforcement of the Dental Practice Act to the extent it forbade teeth whitening by anyone other than a dentist. Following completion of discovery, the parties filed cross-motions for a summary judgment on August 8, 2014. In support of their respective motions for a summary judgment, the parties submitted the testimony of Westphal and Wilson as well as reports from their retained experts.
Westphal testified that he has operated Natural White LLC in North Carolina since 2012 and that, if successful in the litigation, he would offer the same services in Alabama that he offers in his North Carolina business. He testified that when customers come to his business they are given an explanation of the products Natural White sells and of the process of teeth whitening. ; Natural White’s services involve the use of a whitening-pen applicator manufactured by BeamingWhite TM. The pen uses a 16% hydrogen-peroxide solu *687 tion. Natural White uses a “Beaming-White Teeth Whitening Guide” to instruct its employees in the use of BeamingWhite products. The guide warns that “16% hydrogen [peroxide] is a very strong gel and therefore is NOT suitable for home use, where customers will use it without your supervision and may hurt themselves.” (Bold typeface and capitalization in original.) The guide further warns that teeth whitening should not be performed on pregnant women or on people who have poor tooth enamel or decalcification, who have periodontal disease, gingivitis, or gums in poor condition, who wear braces, who recently had oral surgery, who have decaying teeth, exposed roots, or open cavities, or who have a history of allergies to peroxide products.
Westphal testified that customers are asked to review and to sign a general customer-information form affirming that they do not have any condition that would contraindicate whitening. Westphal stated that he does not take a medical history or ask his customers about any allergies they might have. Customers are told that not all causes of tooth discoloration will respond to peroxide-based whitening and that they should whiten their teeth only if they have healthy teeth, but Natural White employees never attempt to diagnose the underlying cause of any tooth discoloration or to determine whether a customer’s teeth are actually healthy. Westphal testified that, based on the manufacturer’s recommendation, Natural White does not offer teeth-whitening services to minors under the age of 14 or to women who indicate that they are pregnant.
According to Westphal, after the customer has reviewed the information form and consented to the whitening process, he or she sits down in a reclining chair. A Natural White employee puts on disposable gloves and opens a prepackaged whitening kit. Each kit contains a single-use lip-and-cheek retractor and a 16% hydrogen-peroxide teeth-whitening pen. The customer is instructed on how to put the retractor in place. Natural White employees tell each customer that gum sensitivity sometimes occurs when whitening teeth and offer them the option of self-applying a single-use Vitamin E stick to their gums before applying the teeth-whitening gel.
When the customer is ready to begin the whitening process, a Natural White employee opens the disposable whitening pen. Westphal testified that in his North Carolina business he uses the whitening pen to apply the whitening gel directly to the customer’s teeth approximately 60-80% of the time; the remainder of the time the customer applies it. He testified, however, that he does not intend to apply the gel to customers in Alabama. Rather, customers in Alabama will- be instructed to apply the whiténing gel to their own teeth. After the gel is applied, the customer is given a pair of tinted glasses and a Natural White employee positions a low-powered LED light in front of his or her mouth. The employee then turns the light on and sets the timer for 15 minutes.
Once the whitening session is complete, a Natural White employee slides the light away, and the customer removes the lip- and-cheek retractor. The customer is given a small cup of water to rinse his or her mouth, and the cup, along with the retractor, is discarded. The customer looks at the mirror .to check the results. If the customer chooses to further whiten his or her teeth, Natural White offers up to two additional ■ 15-minute sessions. Westphal testified that, after each customer, a Natural White employee cleans the tinted glasses, the LED light, and the reclining chair with an ammoniarbased cleaner. Further, *688 the gloves worn by the Natural White employee are discarded after each use.
Wilson previously operated a teeth-whitening business in Alabama. Wilson began offering teeth-whitening services to customers at her cosmetology salon. In 2006, Wilson sold her salon and formed BEKS Inc., d/b/a BriteWhite Whitening Systems (“BriteWhite”), a company that sells peroxide-based teeth-whitening products and equipment. The BriteWhite whitening system is an LED-based teeth-whitening system that BriteWhite designed and produces. The device consists of a base housing its internal components and an extension that plugs into the base and is fitted with a mouthpiece containing small, integrated LED lights. To market Brite-White and its products, Wilson traveled to salons and spas to perform teeth-whitening services and to demonstrate use of the system.
In performing teeth-whitening services, Wilson first had customers review and sign a general information form. Wilson never examined the customer’s mouth to determine if there was some medical reason not to perform the whitening procedure. Nor did she ever attempt to diagnose the underlying cause of any tooth discoloration or to determine whether a customer’s teeth were actually healthy. The customer was instructed to sit in a reclining chair. •'■Wilson or her employee put on single-use disposable gloves and would wrap a single-use plastic barrier sleeve over the mouthpiece of the BriteWhite unit. The whitening gel used by BriteWhite was a 35% carbamide-peroxide teeth-whitening gel, which contained the equivalent of 12% hydrogen peroxide. Wilson testified that she discovered that the most effective method of applying the gel was to have the customer apply it directly to his or her own teeth using a single-use applicator brush and then to insert the mouthpiece. Once the mouthpiece was inserted, the blue LED lights built into the mouthpiece were turned on for a 20-minute cycle. After the session was complete, the customer would remove the mouthpiece and discard the used barrier sleeve. The customer would then rinse his or her mouth with a small cup of water, and the cup was also discarded. Wilson or her employee would use a disinfecting cleaner • to clean the equipment and the reclining chair after each session.
In support of their motion for summary judgment, Westphal and Wilson submitted a report from their expert, Dr. Martin Giniger, a licensed dentist with a Ph.D. in Biomedical Science and extensive experience in the field of peroxide-based teeth whitening. Giniger stated that peroxide-based teeth whitening is generally regarded as safe and effective and that any potential side effects are mild and temporary. Giniger stated that about 50% of people experience temporary sensitivity of the teeth or minor soft-tissue irritation following teeth whitening. He stated that that sensitivity is believed to be the result of dehydration of the teeth and tissues caused' by the bleaching gels when held against the teeth but that those effects are typically mild arid invariably transient. He stated that there are rio reports that people who undergo nori-dentist-provided teeth bleaching experience a greater or more severe- incidence of sensitivity than do those whó undergo bleaching provided by dentists or' by self-application of over-the-counter products. Furthermore, although Giniger noted that higher concentrations of carbamide peroxide may cause soft-tissue irritation, he stated that reported literature-finds that all soft-tissue irritation abates within days of teeth bleaching and that no study has1 shown adverse long-term effects of teeth whitening on oral soft tissue. .
*689 Giniger also noted that hydrogen peroxide and carbamide peroxide have been found to result in minor reversible enamel-surface changes. He states, however, that studies have shown that such changes are “no different from those that occur after drinking a glass of orange juice, and [that] any decalcification is' quickly reversed when teeth are exposed to saliva.” Gini-ger further stated that there was little evidence of any possible systemic side effects from the use of hydrogen peroxide or carbamide peroxide in teeth whitening. According to Giniger, although studies have shown adverse effects at repeated high exposures, no adverse effects are likely from the small level of hydrogen peroxide used in teeth whitening. Additionally, Giniger testified that other ingredients used in teeth whitening — water, glycerine, Carbopol, sodium hydroxide, sodium acid pyrophosphate, sodium saccharin, flavorings — are also considered safe even if" accidentally ingested. Giniger also stated that the LED light systems used for teeth whitening are low-poweréd, comparable to a consumer flashlight, and not harmful.
Finally, Giniger stated that the risks of non-dentist teeth whitening are the same as those of unregulated teeth-whitening products sold directly to consumers for home use. Certainly, he testified, those risks are much, less than the risks associate ed with tongue piercing, which requires no oversight by a licensed dentist.
The Dental Board submitted expert testimony of Dr. Kenneth Tilashalski, a licensed dentist and a professor at the University of Alabama at Birmingham School of Dentistry. Tilashalski stated that it is recognized in the dental profession that certain preexisting conditions could render a whitening procedure ineffective or even harmful to an individual’s oral health. He stated that many oral conditions preclude the use of bleaching agents. He stated that, in determining whether a teeth-whitening -treatment is appropriate for a consumer, the practitioner should consider the consumer’s tooth-decay history, tooth sensitivity, oral mucosal disorders, existence of restorations and/or prostheses, and any underlying reason(s) for tooth discoloration. Tilashalski notes that non-dentist practitioners lack the educational foundation in oral health care, anatomy, and physiology to make an informed decision on whether teeth whitening is appropriate for a particular customer.
' Next, Tilashalski stated that teeth-whitening procedures present the potential for sanitation and infection risks. Tilashalski stated that, in any setting involving mucosal membranes, any number of pathogens, microbes, viral particles, and/or bacteria that are subject to contact, droplet, or airborne transmission may be present. He contended that the lack of formal healthcare training by non-dentist teeth-whitening practitioners may lead to poor practices regarding sanitation, causing adverse consequences to both customers,.and employees. ■
Tilashalski further c'ontended that the “specialized support and advice” offered by non-dentist teeth-whitening practitioners provides an illusion of professional expertise and supervision -without: the benefits of a trained dentist., Tilashalski opined that customers who visit non-dentist teeth-whitening practitioners might be less likely to visit a dentist because of a faulty belief that they are periodically being seen by a professional who would notify them of any oral problems requiring treatment.
Tilashalski also noted the variety of products and procedures used by non-dentist practitioners in the teeth-whitening business. Practitioners use a variety of chemical compounds of varying strengths and composition. There are different methods for applying the chemicals to the *690 teeth, and variations exist in the duration and frequency of treatments. According to Tilashalski, the significant variations among the products and procedures used in non-dentist teeth whitening create uncertainty and risk that a product may be used, or used in a way, that is harmful to the consumer.
Finally, Tilashalski noted that numerous studies have demonstrated adverse effects of bleaching compounds on dental restorations, including increased surface roughness, marginal breakdown, decreases in tooth-to-restoration-bonds strength, and the release of metallic ions and possibly increased exposure to mercury.
The Dental Board also presented the testimony of Dr. Michael Manisealco, a dentist who has practiced in Birmingham since 1981. Manisealco- has performed peroxide-based teeth whitening since 1983. He testified that he always conducts a pretreatment examination in order to confirm that a patient does not have health problems or injuries' that would make teeth whitening inappropriate. He testified that he has personally witnessed peroxide burns of the lips and gums and cases of extreme - sensitivity to .the whitening agents. -
It is undisputed that teeth-whitening services -performed by non-dentists are usually cheaper than teeth-whitening services performed by dentists. Two members of the Board of Dental Examiners, Northcutt and Willis, both charge as much as $600 for teeth-whitening services. Manisealco charges between $460 and $650 for in-office teeth whitening. Westphal, on the other hand, charges between $79 and $129. The Board of Dental Examiners has never received a complaint that-any person was harmed by any teeth-whitening procedure performed in Alabama,
The Jefferson Circuit Court conducted a hearing on the cross-motions for a summary judgment on September 4, 2014. On October 3, 2014, the circuit court entered an order granting the Dental Board’s motion for a summary judgment and denying Westphal and Wilson’s motion for a summary judgment and entered a judgment in favor of the- Dental Board and against Westphal and Wilson on all claims. The circuit court concluded that, given the undisputed facts, the restriction in the Dental Practice Act providing that-teeth whitening can be performed only by dentists does not violate the Alabama Constitution. Westphal and Wilson appealed.
II. Standard of Review'
“The standard of review applicable to a summary judgment is the same as the standard for granting the motion — ” McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.l992y. A summary judgment is proper when there is. no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P. Westphal and Wilson do not argue that there is any genuine issue of material fact that precludes a summary judgment in this case; they argue that, under the undisputed facts, the Dental Board is ' not entitled to a judgment as a matter of law and that, therefore, the summary judgment is improper.
‘This case concerns a constitutional challenge to Alabama’s statutory prohibition of teeth-whitening services as performed by non-dentists. “This Court’s review of constitutional challenges to legislative enactments is de novo.” Northing-ton v. Alabama Dep’t of. Conservation & Natural Res., 33 So.3d 560, 564 (Ala. 2009).[1]
*691 ‘“[A]cts of the legislature are presumed constitutional. State v. Alabama Mun. Ins. Corp., 730 So.2d 107, 110 (Ala.1998). See also Dobbs v. Shelby County Econ. & Indus. Dev. Auth., 749 So.2d 425, 428 (Ala.1999) (“In reviewing the constitutionality of a legislative act, this Court wall sustain the act ‘ “unless it is clear beyond reasonable doubt that it is violative of the fundamental law.” ’ ” White v. Reynolds Metals Co., 558 So.2d 373, 383 (Ala.1989) (quoting Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944))). We approach the question of the constitutionality of a legislative act “ ‘ “with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of government.” ’ ” Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000) (quoting Moore v. Mobile Infirmary Ass’n, 592 So.2d 156, 159 (Ala.1991), quoting in turn McAdory, 246 Ala. at 9, 18 So.2d at 815).
“ ‘Moreover, in order to overcome the ■ presumption of constitutionality, ... the party asserting the unconstitutionality of the Act .., bears the burden “to show that [the Act] is not constitutional.” Board of Trustees of Employees’ Retirement Sys. of Montgomery v. Talley, 291 .Ala. 307, 310, 280 So.2d 553, 556 (1973). See also Thorn v. Jefferson County, 375 So.2d 780, 787 (Ala.1979) (“It .is the law, of course, that a party attacking a statute has the burden of overcoming the presumption of constitutionality....”).’
“State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala.2006).”
State v. Lupo, 984 So.2d 395, 397-98 (Ala. 2007).
III. Analysis
In White Smile, decided before the amendment to the Déntal Practice Act that is the subject of this appeal, this Court was presented with the question whether the Dental Practice Act prohibited a teeth-whitening business similar to those sought to be operated by Westphal and Wilson. We summarized the issue as follows:
“Article 34, Chapter 9, Ala.Code 1975, regulates 'the practice of dentistry in Alabama. Section 34-9-3 requires the licensing of dentists, and § 34-9-43 grants the Board the authority to regulate the professional activities of dentists in Alabama. Section 34-9-6 defines the practice of dentistry, stating:
“ ‘Any person shall be deemed to be practicing dentistry who performs, or attempts or professes to perform, any dental operation or dental service of any kind, gratuitously or for a salary, fee, money or other remuneration paid, or to be paid, directly or indirectly, to himself, or to any person on his behalf, or to any agency which is a ■ proprietor of a place where dental operations or dental services are'"performed
“(Emphasis added.) Section 34-9-6 then lists'10[, now 12,] other'activities that constitute the practice of dentistry under Chapter 9. The ultimate issue in this action is whether the sale of Light-White with in-store application . is the practice of dentistry within the meaning of § 34-9-6.”
36 So.3d at 13. Under similar, but not identical, facts to those currently before us, we concluded in White Smile that the teeth-whitening service at issue there constituted the “practice of dentistry” as that term was then defined by § 34-9-6. In *692 2011, the legislature amended § 34-9-6, removing any further doubt as to whether teeth-whitening services were included within the practice of dentistry. Section 34-9-6 now reads, in part:
“Any person shall be deemed to be. practicing dentistry who does any of the following:
[[Image here]]
“(12) Professes to the public by any method to bleach human teeth, performs bleaching of the .human teeth alone or within his or her business, or instructs the public within his or her business, or through any agent or employee .of his or her business, in the use of any tooth bleaching product.”
Thus, unlike the question before the Court in White Smile, the question before us is not whether non-dentist teeth whitening falls within the- practice of dentistry — it clearly does under § 34-9-6(12). Rather, the question is whether, by extending dentistry’s occupational-licensing regime to include teeth-rwhitening services such as those sought to be offered by Westphal and Wilson, the legislature has violated Westphal’s and Wilson’s due-process rights under the Alabama Constitution.
Westphal and Wilson contend that the professional-licensing requirement that prohibits the operation of their teeth-whitening businesses violates the due-process guarantees of Art. I, §§ 6 and 13, Alabama Constitution of 1901.[2] Specifically, they contend that the statute that prohibits non-dentists from performing teeth-whitening services is an unreasonable and arbitrary exercise of the police power.
This Court has long held that “[t]he power of a reasonable regulation of the professions or occupations where the services [are] to be rendered to the public is justified under the police power of government.” State ex rel. Bond v. State Bd. of Med Exam’rs, 209 Ala. 9, 10, 95 So. 295, 296 (1923). Nevertheless, “[i]n the exercise of this power, the prohibition or test contained in the' statute, ordinance, or rule should be enacted, ordained, or adopted with reference to the object to be attained and as not unduly to interfere with private business, or impose unusual or unnecessary restrictions upon lawful occupations or professions.” Id. This Court has held that the right to due process under the Alabama Constitution is violated when a statute, regulation, or ordinance imposes unnecessary and unreasonable restraints upon the pursuit .of useful activities. In addressing whether a statute, regulation, or ordinance is unreasonable, this Court applies the doctrine of overbreadth.
“ ‘The doctrine of overbreadth recognizes that a state legislature may have a legitimate and substantial interest in *693 regulating particular behavior, but “that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.” Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) [quoting Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) ]. Historically, the overbreadth doctrine has been used by the federal courts to prevent a chilling effect on First Amendment freedoms.... However, the overbreadth doctrine under the Alabama Constitution has been applied in due process cases not involving First Amendment freedoms. See Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala.1983).’
“[Friday v. Ethanol Corp.,] 539 So.2d [208] at 215 [ (Ala.1988) ]. In Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala.1983), this Court stated:
“ ‘Statutes and regulations are void for overbreadth if their object is achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms .... ’
“437 So.2d at 85.
“ ‘This Court has also recognized that the right to due process under the Alabama Constitution is violated when a statute, regulation, or ordinance imposes restrictions that are unnecessary and unreasonable upon the pursuit of useful activities in that they do not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity.’
“Friday v. Ethanol Corp., 539 So.2d at 216 (citing Ross Neely Express, Inc., 437 So.2d at 84-86; City of Russellville v. Vulcan Materials Co., 382 So.2d 525, 527-28 (Ala.1980); Leary v. Adams, 226 Ala. 472, 474, 147 So. 391 (1933); Baldwin County Bd. of Health v. Baldwin County Elec. Membership Corp., 355 So.2d 708 (Ala.1978)).
“ ‘ “The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary.”’ Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (quoting Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954)). If an ordinance is ‘ “fairly debatable, a court will not substitute its judgment for that of the municipal government body acting in a legislative capacity.” ’ City of Russellville v. Vulcan Materials Co., 382 So.2d at 526 (quoting City of Birmingham v. Norris, 374 So.2d 854, 856 (Ala.1979))....”
Scott & Scott, Inc. v. City of Mountain Brook, 844 So.2d 577, 594-95 (Ala.2002). Further, this Court has explained:
“ ‘The validity of a police power regulation ... primarily depends on whether under all the existing circumstances, the regulation is reasonable, and whether it is really designed to accomplish a purpose properly falling within the scope of the police power. Crabtree v. City of Birmingham, 292 Ala. 684, 299 So.2d 282 (1974).... Otherwise expressed, the police power may not be employed to prevent evils of a remote or highly problematical character. Nor may its exercise be justified when the restraint imposed upon the exercise of a private right is disproportionate to the amount of evil that will be corrected. Bolin v. State, 266 Ala. 256, 96 So.2d 582, conformed to in 39 Ala.App. 161, 96 So.2d 592 (1957).’
*694 “Statutes and regulations are void for overbreadth if their object is achieved by means which sweep unnecessarily -broadly and thereby invade the area of protected freedoms. • See Zwickler v. Koota, 389 U.S. 241 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).”
Ross Neely Express, Inc. v. Alabama Dep’t of Envtl. Mgmt., 437 So.2d 82, 84-85 (Ala.1983) (quoting City of Russellville v. Vulcan Materials Co., 382 So.2d 525, 527 (Ala.1980)).
In State v. Lupo, supra, this Court held that the Alabama Interior Design Consumer, Protection Act,, which required professional licensing of -all persons performing the “practice of interior design,” was unconstitutional. The legislative act at issue in Lupo broadly defined the practice of interior design to include such things as selecting paint colors and pillows for a sofa. Applying the doctrine of overbreadth to the facts of that case, we concluded that “the Act ‘“impose[d]' restrictions that [were] unnecessary and unreasonable upon-the pursuit of useful activities” ’ and- that those restrictions “[did] not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity.’”” 984 So.2d at 406 (quoting Scott & Scott, 844 So.2d at 594, quoting in turn Friday v. Ethanol Corp., 539 So.2d 208, 216 (Ala. 1988)). Consequently, we held that the Interior Design Consumer Protection Act violated the due-process protections of the Alabama Constitution.
In this case, there can be no dispute that the practice of dentistry, generally speaking, relates to the public health and is, therefore, a. legitimate subject of the State’s police power.[3] Moreover, teeth whitening is unquestionably a dental treatment. In White Smile we held that teeth-whitening services similar to those at issue here were -“dental services.” 36 So.3d at 14 (“The commonly accepted definition of ‘dental service’ is ... a helpful act or useful labor of or relating to the teeth.”). Indeed, the record shows that peroxide-based teeth bleaching was initially developed and performed by dentists. Teeth-whitening services, then, fall naturally within the sphere of dentistry.[4] The legislature, moreover, has expressly provided that teeth whitening falls within the “practice of dentistry,” and a presumption of constitutionality attaches to this legislative pronouncement. See, e.g., State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala. 2006).
In light of this presumption, we cannot say that the inclusion of teeth-whitening services, like those offered by West-phal and Wilson, within the definition of the practice of dentistry in the Dental Practice Act is not reasonably related to public health, safety, or general welfare. *695 Teeth whitening is a form of dental treatment that requires the application of a chemical bleaching agent directly to the customer’s teeth. The evidence in the record indicates that the procedure is relatively safe but that it is not without potential adverse effects. There is evidence indicating that some people have suffered peroxide burns of the lips and gums as a result of exposure to bleaching compounds; others experience, albeit temporarily, mild to moderate tooth sensitivity or irritation of the soft tissue in the mouth.
The materials before us indicate that teeth whitening is inappropriate for people with particular dental conditions, conditions a layman may not be able to recognize or diagnose. Moreover, teeth-whitening compounds may damage dental restorations or prostheses; alternatively, they may have no effect on restorations, resulting in color mismatching of teeth. Teeth whitening may not be effective as to some types of discoloration. Furthermore, tooth discoloration may be caused by an underlying condition or disease, which a non-dentist likely would not detect. In such cases, teeth whitening might serve to mask an underlying condition and delay necessary treatment. Therefore, it is not unreasonable to conclude that pretreatment examination and subsequent assessment of each teeth-whitening consumer’s situation by a professional dentist could reduce the risk of the adverse effects of teeth whitening, could help consumers avoid ineffective or unnecessary treatments, and could diagnose and treat underlying conditions. Finally, teeth-whitening services involve contact with the mucosal membranes of the mouth, which raises concerns of sanitation and infection — areas in which dentists receive specialized education and training.
These concerns and others do not appear trivial. Given the deferential standard of review in a statutory challenge, we cannot say that provision that includes teeth-whitening services within the scope of the practice of dentistry, thus limiting the performance of those services to licensed dentists, violates the due-process protections of the Alabama Constitution.
Finally, we note that Westphal and Wilson also raise a number of public-policy arguments in support of their contention that non-dentists should be permitted to offer teeth-whitening services. ' For example, they argue that limiting teeth-whitening services to licensed dentists, who typically charge more than non-dentists for the services, increases the cost of teeth whitening for consumers. They argue that the primary effect of the prohibition on non-dentist teeth whitening is economic protectionism in favor of dentists. They also note that other activities unregulated by the Board of Dental Examiners, like oral piercing, pose a vastly greater threat to public health and safety than does teeth whitening. Whatever the merits of these arguments,
“[i]n passing on the validity of a statute it must be remembered that the legislature, except insofar as specifically limited by the state and federal constitutions, is all-powerful in dealing with matters of legislation; ... [and] that all questions of propriety, wisdom, necessity, utility and expediency in the enactment of laws are exclusively for the legislature, and are matters with which the courts have no concern.”
Surtees v. VFJ Ventures, Inc., 8 So.3d 950, 983 (Ala.Civ.App.2008) (quoting Jansen v. State ex rel. Downing, 273 Ala. 166, 168, 137 So.2d 47, 48 (1962)).
IV. Conclusion
For the foregoing reasons, we hold that the requirement in the Dental Practice Act *696 that teeth-whitening services be performed by licensed dentists does not violate the due-process protections of the Alabama Constitution of 1901. Accordingly, the judgment of the circuit court is affirmed.
AFFIRMED.
MOORE, C.J., and STUART, BOLIN, MURDOCK, WISE, and BRYAN, JJ., concur.
PARKER and SHAW, JJ., concur in the result.

. The principle quoted from Northington expresses the general principle that this Court *691 considers de novo pure questions of law and the application of law to settled facts. Smith’s Sports Cycles, Inc. v. American Suzuki Motor Corp., 82 So.3d 682, 684 (Ala.2011).

. Westphal and Wilson also assert that the prohibition of non-dentist teeth-whitening services violates the equal-protection guarantees they contend are contained in §§ 1, 6, and 22, Alabama Constitution of 1901. As to the issue whether the Dental Practice Act violates §§ 1, 6, and 22, either separately or collectively, it was incumbent on Westphal and Wilson to make specific arguments regarding how the Act violated those sections. West-phal and Wilson, however, malee only one specific reference to §§ 1, 6, and 22 in the introductory portion of their brief and make no specific arguments concerning the purported equal protection conferred by these provisions or how it has been violated — failing even to quote any portion of the constitutional provisions. Moreover, their arguments appear to rely chiefly on the overbreadth doctrine, which we have held falls within the due-process protections of the Alabama Constitution. Given the lack of contextual analy- • sis to support their “equal protection” argument, we decline to address it. See White Sands Grp., L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008). Westphal and Wilson do not assert any violation of the Equal Protection Clause of the United States Constitution,

. Section 34-9-2, Ala.Code 1975, provides, in part:
“The Legislature hereby declares that the practice of dentistry and the practice of dental hygiene affect the public health, safety, and welfare and should-be subject to regulation. It is further declared to be a matter of public interest and concern that the dental profession merit and receive the confidence of the public and that only qualified dentists be permitted- to practice dentistry and only qualified dental hygienists be permitted to practice dental hygiene in the State of Alabama. All provisions of this chapter relating to the practice of dentistry and dental hygiene shall be liberally construed to carry out these objects and purposes.” . ...

. We express reluctance to opening the door for judicial determinations as to what particular procedures or services within an accepted field of professional practice might be safely carved out for performance by laymen.