Rel: February 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

————————————————

### SC-2022-0641

————————————————

## Mobile Infirmary Association d/b/a Mobile Infirmary Medical Center

## v.

## Quest Diagnostics Clinical Laboratories, Inc.

### Appeal from Mobile Circuit Court
### (CV-17-900403)

SHAW, Justice.

Mobile  Infirmary  Association  d/b/a  Mobile  Infirmary  Medical

Center ("Mobile Infirmary"), the plaintiff seeking contractual indemnity in the action below, appeals the Mobile Circuit Court's summary judgment in favor of the defendant below, Quest Diagnostics Clinical Laboratories, Inc. ("Quest"). We affirm.

Facts and Procedural History

On March 17, 2014, Quest and Mobile Infirmary entered into a Laboratory Management Agreement ("the LMA"), in which Quest agreed to manage Mobile Infirmary's onsite clinical laboratory facilities and to provide clinical testing services used by Mobile Infirmary's medical staff to diagnose and treat patients. The LMA also contained indemnity provisions. Specifically, Section 8.1 of the LMA stated, in pertinent part:

> "Quest Diagnostics hereby agrees to indemnify, defend and hold [Mobile Infirmary], and [Mobile Infirmary's] officers, directors, employees and agents (collectively, the 'Lab Indemnitees'), harmless from and against any and all liability, losses, damages, claims or causes of action ('Claims'), and expenses connected therewith, including reasonable attorneys' fees, that are caused by or a result of (i) any negligent or intentional act, error or omission by Quest Diagnostics, its employees, agents, servants or representatives with respect to its responsibilities and/or the performance of Services hereunder, to the extent such Claim does not arise from an act or omission or cause for which [Mobile Infirmary] is required to provide indemnity pursuant to Section 8.2 below … [or] (v) any personal injury (including death) or property damage caused by or arising from the negligence, acts or omissions of Quest Diagnostics or any

2

employee or agent of Quest Diagnostics ...."

Section 8.2 of the LMA addressed Mobile Infirmary's indemnity obligations:

"[Mobile Infirmary] hereby agrees to indemnify, defend and hold Quest Diagnostics and Quest Diagnostics Affiliates, officers, directors, employees and agents (collectively, the 'Quest Indemnitees') harmless from and against any and all Claims, and expenses connected therewith, including reasonable attorneys' fees, (i) directly caused by or as a result of any negligent or intentional act, error or omission by [Mobile Infirmary], its employees, agents, servants, contractors or representatives with respect to its responsibilities hereunder, to the extent such Claim does not arise from an act or omission or cause for which Quest Diagnostics is required to provide indemnity pursuant to Section 8.1 above ... [or] (v) any personal injury (including death) or property damage caused by or arising from the negligence, acts or omissions of [Mobile Infirmary] or any employee or agent of [Mobile Infirmary] ...."

On March 13, 2015, James A. Ward went to Mobile Infirmary's emergency room after suffering weakness, dizziness, loss of fluids, a mild cough, and severe body aches. While there, he was diagnosed with the flu, and he was later discharged with a prescription for medication. Two days later, Ward's symptoms worsened, and he returned to the emergency room. Ward was eventually diagnosed with diabetic ketoacidosis.

When his condition did not improve, Ward was moved into the

intensive-care unit, at which point his doctor ordered him to undergo glucose finger-sticks and a basic metabolic panel every four hours to help monitor his serum glucose, kidney function, acid/base status, and electrolytes. According to Mobile Infirmary, those basic metabolic panels were supposed to be performed by Quest, but they were allegedly canceled by one of Quest's employees.

Over the next several hours, Ward developed cardiac dysfunction and lost consciousness. At some point, he suffered an "anoxic brain injury" and later died "as a result of multisystem organ failure secondary to severe sepsis and septic shock."

In 2017, Ingrid Mia Ward ("Mia"), Ward's wife and the personal representative of his estate, commenced a wrongful-death action against Mobile Infirmary and other defendants, including Mobile Infirmary's doctors and nurses who were responsible for Ward's treatment and care. Mia alleged that the defendant medical-care providers had breached the standard of care in several ways, including by "failing to obtain serial basic metabolic panels every four hours" and by "failing to properly monitor and report Mr. Ward's blood glucose levels on an hourly basis." She also alleged that Mobile Infirmary was vicariously liable for those

4

who "undertook to and did provide medical, diagnostic, nursing, technical, and/or other health care services and treatment to [Ward]." According to Mia, her husband died as a proximate result of the acts or omissions of Mobile Infirmary and its staff in failing to properly diagnose and treat his condition.

Quest was not named as a party to Mia's action. Mobile Infirmary informed Quest of the action and, as the case progressed, apprised Quest of the status of the proceedings, including its negotiations with Mia for potential settlement of the lawsuit. Mia and Mobile Infirmary ultimately settled the wrongful-death action. Before Mia's claims against Mobile Infirmary were dismissed pursuant to a joint motion of those parties, Mobile Infirmary filed a third-party complaint against Quest in which it sought contractual and equitable indemnity related to its defense and settlement of Mia's action. Quest filed a motion to dismiss, which the trial court granted in part by dismissing Mobile Infirmary's equitable-indemnity claim.

Mobile Infirmary later amended its complaint to more specifically state its remaining claim of contractual indemnity against Quest. Mobile Infirmary alleged:

5

"4. The claims of [Mia] against Mobile Infirmary in this action were caused by and/or resulted from negligent acts, errors or omissions of Quest in its responsibilities under the [LMA] and/or the performance of services under [the LMA], and said claims did not arise from an act or omission or cause for which Mobile Infirmary is required to provide indemnity to Quest pursuant to Section 8.2 of the [LMA]. Such negligent acts, errors or omissions included the following:

"a. Quest's failure to timely collect, test, diagnose and/or report the results of blood work ordered by doctors and other healthcare providers in connection with the care and treatment of the … Decedent, James Ward, on a timely basis, in breach of its duties under the [LMA] ….

"b. Quest's unwarranted delay in collecting, testing, diagnosing and/or reporting the results of blood work ordered by physicians and other healthcare providers in connection with the care and treatment of … James Ward, in breach of its duties under the [LMA] ….

"c. Quest's cancellation of physicians' and other healthcare providers' orders for blood work needed in the care and treatment of [Mia's] Decedent, James Ward, in breach of its duties under the [LMA] ….

"5. As a proximate result of the aforesaid negligence, the physicians and other healthcare providers attending Mr. Ward lacked the information necessary to appropriately monitor and assess his condition on a timely basis and to administer the appropriate amounts of insulin and IV fluids, and take other action, in accordance with his on-going condition and, as a proximate result thereof, Mr. Ward died."

Quest later served Mobile Infirmary with a set of requests for

admissions, to which Mobile Infirmary provided the following responses:

"1. Admit that there were allegations of negligence in the Third Amended Complaint filed by Mia Ward, as personal representative of the Estate of James Ward, against Mobile Infirmary Medical Center that did not relate to the laboratory services provided by Quest Diagnostics pursuant to the [LMA] (hereinafter the 'non-lab allegations.').

"<u>RESPONSE:</u> Admitted.

"2. Admit that the death of James A. Ward was caused, in part, by the negligence of Mobile Infirmary Medical Center.

"<u>RESPONSE:</u> Admitted.

"3. Admit that the death of James A. Ward was caused, in part, by the negligence of Mobile Infirmary Medical for non-lab allegations.

"<u>RESPONSE:</u> Denied.

"4. Admit that the death of James A. Ward was caused, in part, by the negligence of Mobile Infirmary Medical Center within the meaning of Section 8.2 of the [LMA] between Quest Diagnostics and Mobile Infirmary Medical Center dated March 17, 2014.

"<u>RESPONSE:</u> Admitted.

"5. Admit that Mobile Infirmary Medical Center is solely seeking indemnification in this matter from Quest for monies it spent in defending itself and for the confidential settlement with the Estate of James A. Ward.

"<u>RESPONSE:</u> Admitted.

"6. Admit that Mobile Infirmary Medical Center

7

incurred legal defenses expenses in defending its conduct for those non-lab allegations referenced in Requests for Admission Nos. 1 and 3.

"RESPONSE: Admitted.

"7. Admit that Mobile Infirmary Medical Center settled the lawsuit filed by Mia Ward, as personal representative of the Estate of James A. Ward, based in part on allegations of Mobile Infirmary Medical Center's own negligent conduct in the care of James A. Ward.

"RESPONSE: Admitted.

"8. Admit that Mobile Infirmary Medical Center settled the lawsuit filed by Mia Ward, as personal representative of the Estate of James Ward, while claims based on allegations of Mobile Infirmary Medical Center's own negligent conduct were still pending.

"RESPONSE: Admitted."

Quest filed a motion for a summary judgment in which it argued in its supporting brief that Mobile Infirmary's contractual-indemnity claim failed as a matter of law. Relying on Mobile Infirmary's responses to its requests for admissions, Quest argued that because Mobile Infirmary's own negligence was at least a partial cause of Ward's death and because the parties had not agreed under either Sections 8.1 or 8.2 in the LMA to indemnify each other against losses caused by the indemnitee's own negligence, it was not required to indemnify Mobile Infirmary for the

settlement of Mia's action. Quest further argued that, absent clear and unequivocal language to the contrary, any argument by Mobile Infirmary that the reciprocal indemnity provisions found in Sections 8.1 and 8.2 of the LMA allowing each party to recover indemnification for the other's negligence also permitted partial indemnification based on the proportionate fault of the indemnitor was meritless.

In response to Quest's motion, Mobile Infirmary filed a cross-motion for a summary judgment in which it argued that, under the LMA and upon proof that Quest's negligent acts or omissions in the performance of its duties under the LMA caused Ward's death, it was entitled to full indemnification from Quest. In the alternative, Mobile Infirmary argued that it was entitled to indemnification for the portion of its losses that were attributable to Quest's negligence under a comparative-fault analysis.

After a hearing, the trial court entered a summary judgment in favor of Quest and denied Mobile Infirmary's cross-motion for a summary judgment. In its judgment, the trial court explained:

> "At this stage, the Parties have not conducted discovery on [Mobile Infirmary's] allegations of negligence against Quest. However, this Court does not need such evidence or lack thereof to rule on the pending motions. Rather, given the

9

foregoing indemnity provisions and [Mobile Infirmary's] admission of negligence, there are two threshold legal questions for this Court to decide at this juncture:

"(1) Is [Mobile Infirmary] precluded from seeking contractual indemnity from Quest when its own independent negligence contributed to the death of Mr. Ward?; and

"(2) Whether the indemnity provisions in Sections 8.1 and 8.2 are ambiguous, and if so, whether an agreement was reached as to comparative fault analysis despite the ambiguity?

"As discussed below, the Court concludes the answer to the first question to be 'Yes', and thus [Mobile Infirmary] cannot recover here. The Court further concludes that the provisions are by [Mobile Infirmary's] own admission ambiguous and as such, the parties did not 'knowingly, clearly, and unequivocally' enter into a comparative fault indemnification contract. For either of these reasons, summary judgment on behalf of Quest is due to be granted."

In support of its conclusions, the trial court explained:

"Section 8.2 of the LMA provides the various scenarios in which [Mobile Infirmary] must indemnify, defend, and hold Quest harmless from and against any and all liability, losses, damages, claims or causes of action. Specifically, Section 8.2(v) requires [Mobile Infirmary] to defend, indemnify, and hold Quest harmless against a death 'caused by or arising from the negligence, acts or omissions of [Mobile Infirmary] or any employee or agent of [Mobile Infirmary].' Based on [Mobile Infirmary's] admission that the death of Mr. Ward was indeed caused, in part, by the negligence of Mobile Infirmary, the Court concludes that Section 8.2(v) is triggered.

10

"The triggering of [Section] 8.2(v) is sufficient to end the Court's inquiry and dictates that Quest is entitled to summary judgment on [Mobile Infirmary's] third-party claim. Because Section 8.2(v) requires [Mobile Infirmary] to hold Quest harmless when [Mobile Infirmary] is negligent, [Mobile Infirmary] cannot advance a third-party claim against Quest while simultaneously conceding it [(Mobile Infirmary)] was negligent. Put another way, Section 8.2(v) imposes a duty on [Mobile Infirmary] to hold Quest harmless when [Mobile Infirmary] or its employees are negligent -- and there is no question they were negligent in this case. [Mobile Infirmary's] attempt here to recover damages from Quest while also admitting negligence defies the hold harmless nature of Section 8.2(v). [Mobile-Infirmary's] Third-Party Complaint is doing the opposite of holding Quest harmless. Accordingly, the Court need not look any further to determine that Quest does not owe [Mobile Infirmary] contractual indemnity in this case, and the Court's inquiry can end here.

"[Mobile Infirmary] is essentially seeking indemnity from Quest for [Mobile Infirmary's] own negligence -- or at least in part for [Mobile Infirmary's] own negligence. See [Mobile Infirmary's] responses to Quest's Requests for Admission …. The Alabama Supreme Court has addressed the standard of review of agreements by one party to indemnify for another's wrongful conduct, stating: 'Agreements by which one party agrees to indemnify [the other] for the consequences of the other's acts or omissions are carefully scrutinized …. An agreement by one person to indemnify the [other] for the other's negligence is <u>enforceable only if</u> the indemnity provisions are <u>unambiguous and unequivocal</u>.' <u>Royal Ins. Co. v. Whitaker Contr. Corp.</u>, 824 So. 2d 747, 752 (Ala. 2002), quoting <u>Industrial Tile, Inc. v. Stewart</u>, 388 So. 2d 171 (Ala. 1980).

"Quest further contends that the competing indemnity provisions of [Sections] 8.1(i) and 8.2(i) cancel each other out when there is mutual negligence. Quest argues that [Section]

8.1(i) cannot be analyzed in a vacuum: if [Mobile Infirmary] is negligent -- as conceded in this case -- [Section] 8.2(i) must be read in conjunction with [Section] 8.1(i). The Court finds that when read together, [Sections] 8.1(i) and 8.2(i) establish that Quest and [Mobile Infirmary] agreed to indemnify the other for their own sole fault when the other is not also at fault. Under these circumstances, [Section] 8.2(i) is triggered because [Mobile Infirmary] has already admitted its own independent negligence. Thus, Quest cannot owe indemnity to [Mobile Infirmary] under [Section] 8.1(i), and the Court's inquiry could also end here.

"In contrast, [Mobile Infirmary] wants the Court to interpret [Section] 8.1(i) independent of [Sections] 8.2(i) and 8.2(v), and find that three (3) words, 'to the extent,' provides the framework for a comparative fault trial where [Mobile Infirmary] can ultimately recover partial indemnity from Quest in proportion to the Parties' respective comparative fault to the Estate of Mr. Ward. The Supreme Court of Alabama requires this Trial Court to find that any such purported agreement between [Mobile Infirmary] and Quest is clear and unequivocal with an agreed-upon formula for it to order a comparative fault trial. Holcim (US), Inc. v. Ohio Cas. Inc. Co., 38 So. 3d 722, 728 (Ala. 2009) (determining that 'if two parties knowingly, clearly, and unequivocally enter into an agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula, then Alabama law will permit the enforcement of that agreement as written'). Here, [Mobile Infirmary] and Quest did not 'knowingly, clearly, and unequivocally' craft Section 8.1(i) to create a comparative fault indemnification contract. This is further supported by the fact that Section 8.1(i) lacks 'an agreed-upon formula' for a comparative fault trial.

"Finally, the Court notes that under no circumstances should it grant [Mobile Infirmary's] Cross-Motion for Partial Summary Judgment against Quest because neither Party

suggest the record establishes negligence by Quest or proximate cause against Quest. The plain language of the agreement does not allow for [Mobile Infirmary] to recover against Quest for [Mobile Infirmary's] own negligence. Thus, the Cross-Motion for Partial Summary Judgment is due to be denied. As discussed above, the Court concludes [Section] 8.1(i) is insufficient to compel a comparative fault trial."

(Emphasis in original.)  Mobile Infirmary appeals.

## Standard of Review

The material issue at this stage of the case does not involve a question of fact. "We review a summary judgment and all questions of law de novo." Pinkerton Sec. & Investigation Servs., Inc. v. Chamblee, 961 So. 2d 97, 101 (Ala. 2006).

## Discussion

On appeal, Mobile Infirmary maintains that Quest was required to indemnify it for the settlement of Mia's wrongful-death action. Specifically, Mobile Infirmary argues that Quest's failure to perform the basic metabolic panels ordered by Ward's doctor caused or contributed to his death and, thus, triggered the indemnity provision found in Section 8.1 of the LMA, thereby entitling it to full indemnification from Quest under that provision. To the extent, however, that its own admitted negligence contributed, at least in part, to Ward's death, Mobile

13

Infirmary argues in the alternative that, under Section 8.1(v) of the LMA, Quest was still required to indemnify it for Quest's proportionate share of the fault in causing or contributing to Ward's death. For these reasons, Mobile Infirmary argues that the trial court erred in entering a summary judgment in Quest's favor.

We address the alternative argument first. The decision in Holcim (US), Inc. v. Ohio Casualty Insurance Co., 38 So. 3d 722, 727 (Ala. 2009), considered the following certified question, as rephrased by the Court: "Whether, under Alabama law, an indemnitee may enforce an indemnification provision calling for the allocation of an obligation or damages based on the respective fault of the indemnitee and indemnitor?" The answer was "in the affirmative": "[I]f two parties knowingly, clearly, and unequivocally enter into an agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula, then Alabama law will permit the enforcement of that agreement as written." Holcim, 38 So. 3d at 729.

In arriving at this answer, the Court first noted that, generally, "joint tortfeasors are not entitled to common-law indemnity or contribution." Id. at 727.

14

"In Vandiver v. Pollak, 107 Ala. 547, 553, 19 So. 180, 182 (1895), this Court explained that the basis of this prohibition is found in the maxim ex turpi causa non oritur actio:

"'As a general principle of the common law it is often stated that indemnity or contribution will not be enforced as between joint wrong-doers. The reason underlying the principle is, that courts will not lend assistance to him who founds his cause of action on an immoral or illegal act -- "Ex turpi causa, oritur non actio." A trespasser confessing that he has injured or taken the property of another, is not entitled to the assistance of courts, instituted as well for the protection of property as for the protection of persons, to recover indemnity or contribution from his associates in the trespass.'"

38 So. 3d at 727. See also Sherman Concrete Pipe Mach., Inc. v. Gadsden Concrete & Metal Pipe Co., 335 So. 2d 125, 127 (Ala. 1976) ("The general rule in Alabama, subject to exceptions, prohibits one of several joint tortfeasors from enforcing contribution from the others who participated in the wrong. This is because of the maxim that no man can make his own misconduct the ground for an action in his own favor.").

Despite the maxim ex turpi causa non oritur actio, indemnity agreements in which the indemnitor agrees to indemnify the indemnitee for the indemnitee's own negligence can be enforced:

"'The Court has, for many years, held that as

15

> between private parties, indemnity contracts are enforceable if the contract clearly indicates an intention to indemnify against the consequences of the indemnitee's negligence, and such provision was clearly understood by the indemnitor, and there is not shown to be evidence of a disproportionate bargaining position in favor of the indemnitee.'

"Industrial Tile, Inc. v. Stewart, 388 So. 2d 171, 175 (Ala. 1980). This rule includes the enforcement of a valid indemnity agreement that requires an indemnitor to indemnify an indemnitee for the indemnitee's own wrongdoing: '[I]f the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language, then such agreements will be upheld.' 388 So. 2d at 176. See also Apel Mach. & Supply Co. v. J.E. O'Toole Eng'g Co., 548 So. 2d 445, 448 (Ala. 1989) ('Although the general rule in Alabama is that joint tort-feasors are not entitled to indemnity, when one joint tort-feasor agrees in writing to indemnify the other, even for claims based on the other's own negligence, the agreement, if it is a valid indemnity agreement, can be upheld, and the joint tort-feasor can receive indemnification.')."

38 So. 3d at 727-28. That said, those agreements must be clear: "However, 'the intention to indemnify the negligence of the indemnitee must clearly appear from the wording of the instrument, but when that intention is clear, the indemnity provisions will be read and construed so as to give them the meaning the parties have expressed.'" Holcim, 38 So.

16

3d at 728 (quoting <u>Eley v. Brunner-Lay S. Corp.</u>, 289 Ala. 120, 124, 266 So. 2d 276, 280 (1972), overruled on other grounds by <u>Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co.</u>, 629 So. 2d 633 (Ala. 1993)).

Because parties may enter into agreements that allow an indemnitee to recover from the indemnitor even for claims resulting solely from the negligence of the indemnitee, this Court saw no legal obstacle to an indemnification agreement calling for the allocation of an obligation or damages based on the respective fault of the indemnitee and the indemnitor, that is, a contractual agreement providing a form of otherwise barred joint-tortfeasor contribution:

> "If, under Alabama law, the maxim <u>ex turpi causa non oritur actio</u> provides no barrier to a contractual agreement in which an indemnitor may obligate himself or herself to pay an indemnitee's obligation resulting from the indemnitee's own wrongs, then, <u>a fortiori</u>, we see no barrier to an agreement between parties for an indemnitor to provide indemnity where the indemnitor's own wrongs also contribute to the creation of the obligation. Similarly, we see no barrier to the freedom of parties to negotiate an agreement providing for the allocation of a proportionate part of the obligation or damages based on the parties' respective fault. As we have previously stated, when '"dealing with an Alabama contract entered into by two competent contracting parties in this State, ... we are mindful of our duty to avoid, if at all possible, infringing upon the rights of either or both."' <u>Shoney's [LLC v. MAC East, LLC]</u>, 27 So. 3d [1216,] 1223 [(Ala. 2009)] (quoting <u>Summers v. Adams Motor Co.</u>, 34 Ala. App. 319, 324, 39 So. 2d 300, 304 (1949))."

17

38 So. 3d at 728-29 (footnote omitted).

This Court held that such agreements,[1] which, again, are contrary to the general prohibition on indemnity or contribution between joint wrongdoers, must themselves be clear: "[I]f two parties <u>knowingly, clearly, and unequivocally</u> enter into an agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula, then Alabama law will permit the enforcement of that agreement <u>as written</u>." <u>Id.</u> at 729 (emphasis added).[2]

As noted previously, in Section 8.1 of the LMA, Quest agreed to indemnify and hold Mobile Infirmary harmless against

> "<u>any and all liability</u>, losses, damages, claims or causes of action … that are caused by or a result of (i) <u>any negligent or intentional act</u>, error or omission <u>by Quest Diagnostics</u>, its employees, agents, servants or representatives with respect to its responsibilities and/or the performance of Services hereunder, <u>to the extent such Claim does not arise</u> from an

---

[1]In <u>Holcim</u>, this Court specifically disclaimed "expressing an opinion as to the proper interpretation" of the agreement in that case. 38 So. 3d at 727.

[2]Given the above, we reject the conclusion of the Eleventh Circuit Court of Appeals in <u>Ohio Casualty Insurance Co. v. Holcim (US), Inc.</u>, 589 F.3d 1361, 1363 n.1 (11th Cir. 2009), in which that court interpreted our decision in <u>Holcim</u> as <u>not</u> requiring such agreements to have "clear and unequivocal language."

act or omission or cause for which [Mobile Infirmary] is required to provide indemnity pursuant to Section 8.2 below … [or] (v) <u>any personal injury</u> (including death) or property damage caused by or <u>arising from the negligence, acts or omissions of Quest Diagnostics</u> or any employee or agent of Quest Diagnostics …."

(Emphasis added.)  Under Section 8.2, Mobile Infirmary in turn agreed to indemnify Quest from and against

"any and all Claims … (i) directly caused by or as a result of any negligent or intentional act, error or omission by [Mobile Infirmary] … <u>with respect to its responsibilities [under the LMA], to the extent such Claim does not arise from an act or omission or cause for which Quest Diagnostics is required to provide indemnity</u> pursuant to Section 8.1 above … [or] <u>(v) any personal injury</u> (including death) … caused by or <u>arising from the negligence, acts or omissions of [Mobile Infirmary]</u> or any employee or agent of [Mobile Infirmary] …."

(Emphasis added.)

Under Section 8.1(v), Quest has agreed to indemnify and hold Mobile Infirmary harmless for "any and all liability" caused by or that was the result of "any personal injury (including death)" that arose out of Quest's negligence, acts, or omissions. Likewise, under Section 8.2(v), Mobile Infirmary has agreed to indemnify and hold Quest harmless for "any and all" claims related to "any personal injury (including death)" that arose from Mobile Infirmary's negligence, acts, or omissions.

Together, these provisions may be read to mean that the parties have agreed to indemnify each other for all liability that may arise from their respective negligence, acts, or omissions.

Mobile Infirmary admitted that Ward's death was caused in part by its negligence within the meaning of Section 8.2; its acts formed a basis for Mia's action (that is, Mia's action arose from Mobile Infirmary's acts). Under Section 8.2(v), it would be required to hold Quest harmless for all claims arising from such acts. If Quest's acts also contributed to Ward's death (that is, if Mia's action also arose from Quest's acts), then, under Section 8.1(v), Quest would hold Mobile Infirmary harmless from all claims arising from such acts. If both of these provisions apply, they could be read to require each party to hold the other harmless from all claims asserted in Mia's wrongful-death action.

Mobile Infirmary argues, however, that Sections 8.1(v) and 8.2(v) instead require each party to indemnify the other for its own proportionate share of fault. As stated previously, Holcim makes clear that parties must "knowingly, clearly, and unequivocally enter into an [indemnity] agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula."

20

38 So. 3d at 729. In the present case, although Sections 8.1(v) and 8.2(v) can be read to address when a claim arises from either party's acts, they do not clearly and unequivocally address what happens when a claim arises out of acts of both parties. The provisions require indemnification for all liability; but, if both are at fault, it is unclear how both can be liable in full. Nowhere in these provisions do the parties expressly agree or clearly provide a formula that, in the event there is a claim that arises out of partial liability or concurrent acts by both parties, indemnification will be required for a proportionate share. Without a "clear" and "unequivocal" agreement addressing indemnification in such a concurrent-fault situation, Mobile Infirmary's proposed reading of these sections does not comply with Holcim.

The same analysis applies to Section 8.1(i). Mobile Infirmary argues that this provision provides a proportionate-fault formula pursuant to which Quest must indemnify it for the portion of the damages resulting from its negligence that caused or contributed to Ward's death. Under Section 8.1(i), Quest has agreed to indemnify Mobile Infirmary against "any and all" claims that are caused by or are the result of "any negligent or intentional act, error or omission by Quest … to the extent

such Claim does not arise from an act or omission or cause for which [Mobile Infirmary] is required to provide indemnity pursuant to Section 8.2." (Emphasis added.) As noted above, Section 8.2(v) can be read to require Mobile Infirmary to hold Quest harmless for all claims asserted in Mia's wrongful-death action. Further, the phrase "to the extent" can be read to mean that indemnity is required "if" the claim does not "arise" from Mobile Infirmary's own conduct, which would be consistent with a reading of Sections 8.1(v) and 8.2(v) requiring indemnity for "sole" fault. However, Mobile Infirmary suggests that the phrase can also be read as providing a quantity or proportion, meaning, "to the degree." If this alternate reading is also viable, it only amplifies the ambiguity of these indemnity provisions, demonstrating that they are not "clear" and "unequivocal" as required by Holcim.

In summary, the LMA could have specified that each party was required to indemnify the other for any proportional share of fault in the case of potential joint liability. The cited provisions do not clearly and unequivocally do so. It might be implied, but so might other reasonable and contrary implications. Thus, Mobile Infirmary's alternate argument does not demonstrate reversible error.

22

As to Mobile Infirmary's initial argument, it contends that, because Sections 8.1(v) and 8.2(v) "cancel each other out," it would not be required to provide any indemnity to Quest under Section 8.2. Thus, it asserts, under Section 8.1(i), Quest would be required to indemnify it "in full" for all damages in Mia's wrongful-death action because the limitation in that part -- "to the extent such Claim does not arise from an act or omission or cause for which [Mobile Infirmary] is required to provide indemnity pursuant to Section 8.2" -- would not apply. (Emphasis added.) We disagree. As the trial court held, "[b]ased on [Mobile Infirmary's] admission that the death of Mr. Ward was indeed caused, in part, by the negligence of [Mobile Infirmary], the Court concludes that Section 8.2(v) is triggered." In such a circumstance, the terms of Section 8.1(i) do not require indemnification by Quest. That Quest could be required to indemnify Mobile Infirmary under Section 8.1(v) does not nullify the fact that Section 8.2(v) was, as the trial court held, "triggered" under the facts of this case.

## Conclusion

For the reasons stated above, the trial court's judgment is affirmed.

AFFIRMED.

23

Wise, Bryan, Sellers, Mendheim, and Stewart, JJ., concur.

Cook, J., concurs specially, with opinion, which Mitchell, J., joins.

Parker, C.J., dissents, with opinion.

COOK, Justice (concurring specially).

I concur with the main opinion. I write specially to clarify my understanding of our holding in this case.

In Holcim (US), Inc. v. Ohio Casualty Insurance Co., 38 So. 3d 722, 729 (Ala. 2009), this Court explained: "[I]f two parties knowingly, clearly, and unequivocally enter into an agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula, then Alabama law will permit the enforcement of that agreement as written." (Emphasis added.) Requiring that indemnity agreements be "clear and unequivocal" is not confined solely to the fact of indemnity but logically extends to the scope of that indemnity (that is, it applies even if the parties are joint tortfeasors). After all, indemnity, contribution among joint tortfeasors, and comparative negligence are all departures from our normal liability rules.

In this case, Mobile Infirmary contends that simply by including the language "to the extent" in the Laboratory Management Agreement's indemnity provisions, the allocation of fault among the parties to those provisions was "clear and unequivocal." It was not. Although the parties string-cited cases from other jurisdictions interpreting similar "to the

25

extent" language in contracts, both sides admit that courts have reached conflicting results on whether this language is ambiguous. In fact, the Eleventh Circuit Court of Appeals held that this language was ambiguous. See Ohio Cas. Ins. Co. v. Holcim (US), Inc., 548 F.3d 1352, 1356-58 (11th Cir. 2008); Ohio Cas. Ins. Co. v. Holcim (US), Inc., 589 F.3d 1361, 1363 (11th Cir. 2009). If a number of courts have found this language to be "ambiguous," such language generally fails the heightened requirement of being "clear and unequivocal."

Although the main opinion alludes to the need for an "agreed-upon formula" in such provisions, I do not understand our holding to require specific, talismanic language or a mathematical formula expressed in numbers or any heightened test of certainty in how a formula will work. For instance, I do not understand our holding to decide whether the words "to the degree" would have been sufficient. The problem here is that the contract was not "clear and unequivocal" regarding whether there would be any allocation if there was concurrent liability. What I understand our holding to say is that such provisions should make clear that some allocation of fault among the parties will occur. If necessary, the court can then apply traditional contract-construction principles to

26

provisions regarding how to actually make that allocation. Clarity is almost always a good thing, and the parties almost always understand -- far better than a court after the fact -- what they truly intend.

Mitchell, J., concurs.

PARKER, Chief Justice (dissenting).

In my view, the issue presented in this case was not decided by Holcim (US), Inc. v. Ohio Casualty Insurance Co., 38 So. 3d 722 (Ala. 2009). And I believe that Sections 8.1(v) and 8.2(v) of the Laboratory Management Agreement are best understood as requiring fault-based apportionment of indemnity between the parties.

First, Holcim did not hold that apportioned-indemnity provisions must be unambiguous to be enforceable. In reading Holcim as so holding, the main opinion overlooks the analytical frame within which that case was decided.

Holcim came to us on a certified question from the United States Court of Appeals for the Eleventh Circuit. The indemnity provision there required indemnification of losses suffered by the indemnitee "'"'to the extent such losses are attributable to the negligence or willful misconduct of [the indemnitor].'"'" Id. at 725 (emphasis added; citations omitted). Before the Eleventh Circuit, the indemnitee argued that the phrase "to the extent" required indemnification based on apportionment of fault between the parties. Id. at 726. The indemnitor argued that the indemnity provision's language was not specific enough to require

apportionment, partly because it did not provide a method for apportionment. Id. The Eleventh Circuit thought both arguments were reasonable. Id. But that court recognized that, if the indemnitee's argument were right and the provision required apportionment, a question would arise whether such a provision is enforceable under Alabama law. That question is the essence of what the Eleventh Circuit certified to us. See id. We rephrased the certified question, distilling it to that essence. Id. at 727.

Crucially for the present case, we then made clear that we would answer the question "[w]ithout expressing an opinion as to the proper interpretation of the actual agreement between [the indemnitee] and [the indemnitor]." Id. In other words, we did not decide the issue disputed by the parties in the Eleventh Circuit -- whether the indemnity provision's language was specific enough to require apportionment. Rather, we did the same thing the Eleventh Circuit had done in certifying the question: We assumed for purposes of our analysis that the indemnitee's view was correct -- that the provision's language was specific enough to require apportionment. That assumption was necessary to the whole analysis that followed, because if the provision did not require apportionment

29

because it was not specific enough, then the certified question -- essentially, whether apportioned-indemnity provisions are unenforceable based on Alabama public policy -- was moot.

In answering the (rephrased) certified question, we reviewed our precedent on contractual indemnity for an indemnitee's own wrongdoing, as discussed in today's main opinion. In summary, under common law, joint tortfeasors were not entitled to indemnity because courts generally will not assist a person whose claim is founded on his own wrongdoing. Id. at 727. Despite that equity-based rationale, courts will enforce contracts in which a party agrees to indemnify for the indemnitee's own negligence. Id. However, to be enforceable, such provisions must be written in clear and unequivocal language and must be entered into by the indemnitor knowingly, evenhandedly, and without disproportionate bargaining position of the indemnitee, id. at 727-28, presumably because of those provisions' tension with equity. Next, we reviewed our precedent on freedom of contract and its general applicability to indemnity. Id. at 728. Finally, we applied these principles by reasoning from the greater to the lesser: If Alabama public policy did not prohibit an indemnitor from contracting to indemnify an indemnitee for the indemnitee's own

wrongdoing, then Alabama public policy also did not prohibit an indemnitor from contracting to indemnify an indemnitee for the indemnitor's apportioned wrongdoing as to a jointly caused harm. Id. at 728. We then concluded: "Accordingly, if two parties knowingly, clearly, and unequivocally enter into an agreement whereby they agree that the respective liability of the parties will be determined by some type of agreed-upon formula, then Alabama law will permit the enforcement of that agreement as written." Id. at 729.

Within that last sentence, the words "knowingly, clearly, and unequivocally" and "by some type of agreed-upon formula" were necessarily dicta. As explained above, the only question before this Court was whether an indemnity provision whose language did require apportionment would be unenforceable under Alabama public policy. Clearly not before us was the question what language was necessary to require apportionment. Both the Eleventh Circuit and this Court had expressly declined to answer that question at that juncture, because both courts were focused on the public-policy question that required assuming that the subject provision required apportionment.

Put another way, today's main opinion views <u>Holcim</u> as requiring that apportioned-indemnity provisions be "clear and unequivocal" and provide a "formula" for apportionment. If that view were correct, in <u>Holcim</u> we would have held at the outset that the provision was unenforceable (and declined to answer the certified question as moot) because the Eleventh Circuit had already determined that the provision was ambiguous. But we did not approach the provision that way, because we were assuming that the provision <u>was</u> enforceable as a matter of language and were examining only whether it was unenforceable as a matter of policy.

There is another reason why that surplus language in <u>Holcim</u>'s conclusion sentence should be understood as dicta: It does not flow from the equitable, public-policy concerns that underlie our cases' "clear and unequivocal" requirement for provisions that agree to indemnification for an indemnitee's own wrongdoing. Such a provision does more than depart from the common-law rule against indemnity among joint tortfeasors. It goes further, requiring an indemnitor to indemnify against the indemnitee's own fault, separate from the indemnitor's fault, thus essentially requiring the indemnitor to act as an insurer. Cf. <u>Industrial</u>

Tile, Inc. v. Stewart, 388 So. 2d 171, 175-76 (Ala. 1980) ("'[S]uch provisions must be construed in favor of the indemnitor in instances where the indemnity is not contracted for from an insurance company engaged in the business of writing, for consideration, such coverage ….'" (citation omitted)). Such an arrangement cuts so deeply against the grain of ordinary principles of equity that, to be enforceable, it must have been entered into with the clearest of notice to the indemnitor. See id. at 176 ("The Court's insistence that such provisions be unambiguous and unequivocal arises from its concern that, generally speaking, one should not be able to contract against the consequences of his own wrong.").

In contrast, a provision that calls for partial indemnity based on apportionment of fault does not trigger that equitable concern. The indemnitor is not indemnifying against the indemnitee's own fault, but only against the indemnitor's fault. Even absent a contractual indemnity provision, the common law itself would likely require that kind of indemnification (via contribution), at least outside the context of joint active tortfeasors. See American S. Ins. Co. v. Dime Taxi Serv., Inc., 275 Ala. 51, 55, 151 So. 2d 783, 785 (1963). An apportioned-indemnity provision merely extends the common law's fault-based scheme of

indemnity/contribution to the joint-tortfeasor scenario. Hence, the equitable justification for a "clear and unequivocal" requirement, so necessary as to an indemnitee's-own-wrongdoing provision, is simply not present when dealing with an apportioned-indemnity provision.

In accord with this view was the Eleventh Circuit's follow-up Holcim decision after we answered the certified question:

> "The Supreme Court of Alabama explicitly declined to express an opinion about the proper interpretation of the language at issue here. Moreover, our conclusion that the contract language is ambiguous does not require the ultimate finding that no valid agreement on this issue existed between the parties. Alabama's requirement for 'clear and unequivocal' language seems to us to apply to those agreements in which an indemnitor agrees to assume the burden of losses attributable to the fault of the indemnitee. Here, however, [the indemnitee] only seeks indemnification from [the indemnitor] to the extent of [the indemnitee's] losses that were caused by [the indemnitor], pursuant to an analysis of comparative fault."

Ohio Cas. Ins. Co. v. Holcim (US), Inc., 589 F.3d 1361, 1363 n.1 (11th Cir. 2009) (citations omitted). In my view, that part of the Eleventh Circuit's decision correctly interpreted our Holcim opinion. That opinion did not hold that apportioned-indemnity provisions must be clear and unequivocal or that they must provide a formula for apportionment.

34

Second, the indemnity provisions here are best interpreted as requiring fault-based apportionment of indemnity between the parties. Outside the context of provisions requiring indemnification for an indemnitee's own wrongdoing, "[w]hen construing an indemnity agreement, this Court has applied the general rules of contract interpretation," Once Upon a Time, LLC v. Chappelle Props., LLC, 209 So. 3d 1094, 1096 (Ala. 2016). Specifically, when confronted with ambiguous indemnity provisions, we have looked to principles of contract interpretation that might resolve the ambiguity. See, e.g., FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc., 914 So. 2d 344, 357-61 (Ala. 2005); Alfa Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 684 So. 2d 1295, 1298-1301 (Ala. 1996).

Thus, I would resolve the present provisions' ambiguity as we would resolve any other, by applying principles of contract interpretation. There are three possible interpretations of Sections 8.1(v) and 8.2(v) in a situation when both parties are at fault: (1) The two parties can obtain indemnification back and forth ad infinitum, (2) the provisions cancel each other out and have no effect, or (3) the provisions require apportionment of fault. "'[W]here there is a choice between a valid

35

construction and an invalid construction [of an indemnity provision,] the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms.'" Once Upon a Time, 209 So. 3d at 1097 (citation omitted). Only option (3), apportionment, avoids both the absurdity of option (1) and the destruction that would result from option (2). Other courts have interpreted similarly dueling indemnity provisions to require apportionment. See Joseph Francese, Inc. v. DOS Concrete Servs., Inc., 47 Mass. App. Ct. 367, 713 N.E.2d 984 (1999); Bank One, N.A. v. Echo Acceptance Corp., 522 F. Supp. 2d 959, 971-73 (S.D. Ohio 2007); Gap, Inc. v. Apex Xpress, Inc., No. A146176, June 14, 2017 (Cal. Ct. App. 2017) (unpublished opinion).

In addition to allowing Sections 8.1(v) and 8.2(v) to be enforceable, this interpretation allows them to be read harmoniously with Sections 8.1(i) and 8.2(i). The (i) subsections require indemnification for "any negligent or intentional act, error or omission by [the indemnitor] ... with respect to its responsibilities ... hereunder, to the extent such Claim does not arise from an act or omission or cause for which [the indemnitee] is required to provide indemnity pursuant to [the corresponding indemnity

36

section] ...." (Emphasis added.) The (v) subsections are more specific, requiring indemnification for "any <u>personal injury (including death) or property damage</u> caused by or arising from the negligence, acts or omissions of [the indemnitor]" (emphasis added) and do not contain the "to the extent" caveat. Under the general/specific canon of construction, specific provisions override general provisions in the specific situations to which they apply. See <u>ERA Commander Realty, Inc. v. Harrigan</u>, 514 So. 2d 1329, 1335 (Ala. 1987); Antonin Scalia & Bryan A. Garner, <u>Reading Law</u> 183-88 (Thomson/West 2012). Thus, under the (i) subsections, generally indemnity is not provided when both parties cause an indivisible harm ("to the extent such Claim does not <u>arise from an act or omission or cause</u> for which [the indemnitee] is required to provide indemnity" (emphasis added)). However, under the (v) subsections, when the harm is specifically personal injury, death, or property damage, there is no prohibition of reciprocal indemnity, and the parties are liable to indemnify each other based on their respective apportioned fault.

Today's main opinion imposes new requirements that apportioned-indemnity provisions be clear and unequivocal and provide a formula for apportionment. Those requirements infringe on the parties' freedom of

37

contract (which we emphasized in <u>Holcim</u>, see 38 So. 3d at 727-28) without any justification in either <u>Holcim</u>'s holding or the equitable principles underlying its analysis. Without such a justification, I would not impose those new requirements.